# United States Court of Appeals
## For the First Circuit

No. 18-2085

OLGA PAULE PERRIER-BILBO,

Plaintiff, Appellant,

v.

UNITED STATES; L. FRANCIS CISSNA, Director,
U.S. Citizenship and Immigration Services,

Defendants, Appellees,

CONGRESS OF THE UNITED STATES,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Thompson, and Barron,
Circuit Judges.

Michael A. Newdow, for appellant.
Scott G. Stewart, Deputy Assistant Attorney General, Civil
Division, U.S. Department of Justice, with whom Francesca Genova,
Trial Attorney, Office of Immigration Litigation, Joseph H. Hunt,
Assistant Attorney General, Matthew J. Glover, Counsel to the
Assistant Attorney General, Civil Division, William C. Peachey,
Director, Erez Reuveni, Assistant Director, were on brief, for
appellees.

April 3, 2020

**TORRUELLA**, **Circuit Judge**.    Plaintiff-appellant Olga Paule Perrier-Bilbo ("Perrier-Bilbo") appeals the district court's order granting summary judgment in favor of the United States and Francis Cissna, the Director of the United States Citizenship and Immigration Services ("USCIS") (collectively, the "Government"), on her claims that the inclusion of the phrase "so help me God" at the end of the oath of allegiance administered at United States naturalization ceremonies violates the Establishment and Free Exercise Clauses of the First Amendment, the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4 ("RFRA"), and the Fifth Amendment equal protection and procedural due process protections.    In addition, Perrier-Bilbo also appeals the district court's order denying her post-judgment motion asserting a due process violation arising from the USCIS Boston Field Office director's conduct in handling and then denying her first naturalization application.    She requests that we declare the federal regulation prescribing the oath's language unconstitutional, that we enjoin USCIS and lower courts from using the phrase "so help me God" during the naturalization ceremony for which she is scheduled, and that we order USCIS to reimburse the $680 she paid for her second naturalization application.    Because we find that the inclusion of "so help me God" as a means of completing the naturalization oath does not violate the First or

-3-

Fifth Amendments or RFRA, and because the post-judgment due process claim was not properly presented below, we affirm.

## I.  Background

### A.  Factual Background

Perrier-Bilbo is a French citizen who moved to Scituate, Massachusetts in 2000.  In 2002, she became a United States permanent resident and subsequently received a green card in 2004. In 2008, Perrier-Bilbo decided to become a United States citizen, so she submitted an application for naturalization to USCIS. After attending an interview with USCIS and passing her English language and civics tests, USCIS granted her application. Perrier-Bilbo then received a form notifying her that she would take the oath of allegiance to the United States on March 4, 2009. This was her last mandatory step towards admission to citizenship. See 8 U.S.C. § 1448(a); 8 C.F.R. § 337.1(a).  The Department of Homeland Security nationality regulations provide the language of the oath, which concludes: "I take this obligation freely, without any mental reservation or purpose of evasion; so help me God." 8 C.F.R. § 337.1(a) (emphasis added).

Perrier-Bilbo's "sincere religious belief system includes the denial that there exists any 'God.'"  Therefore, in January 2009, she wrote to USCIS requesting that the oath be administered without the phrase "so help me God."  USCIS informed

-4-

Perrier-Bilbo in April 2009 that she could either "participate in the oath ceremony and omit the 'so help me God' language, or schedule a private oath ceremony where the government would not use that phrase."[1]  Months later, in August 2009, USCIS sent Perrier-Bilbo a letter giving her "15 days in which to notify USCIS which of the options provided to [her was] acceptable" and warning her that if she failed to respond or "decline[d] to specify one of the options," USCIS would reopen her case and "deny [her] application for naturalization for lack of prosecution."

That same month, Perrier-Bilbo's lawyer sent a letter to the director of the USCIS Boston Field Office, Karen Haydon ("Director Haydon"), to alert her that Perrier-Bilbo had retained him as counsel and "that neither of the two options provided w[ould] satisfactorily resolve the problem."  He proposed that the solution was "merely that the religious verbiage be removed from

---

[1]  The federal regulation allows for the alteration of the oath in certain cases:

> When a petitioner or applicant for naturalization, by reason of religious training and belief (or individual interpretation thereof), or for other reasons of good conscience, cannot take the oath prescribed . . . with the words "on oath" and "so help me God" included, the words "and solemnly affirm" shall be substituted for the words "on oath," the words "so help me God" shall be deleted, and the oath shall be taken in such modified form.

8 C.F.R. § 337.1(b).

the oath, as the First Amendment mandates." Subsequently, Perrier-Bilbo's attorney twice attempted to obtain an update on Perrier-Bilbo's request. In May 2010, Director Haydon acknowledged the correspondence, but pointed out that Perrier-Bilbo's lawyer had not submitted a notice of appearance form and consequently, because he was not authorized to respond on Perrier-Bilbo's behalf, the response letter he had sent "d[id] not constitute a response to the USCIS's notice of its intent to reopen" Perrier-Bilbo's application for naturalization. USCIS therefore denied the application as abandoned but noted that Perrier-Bilbo could file a new application at any time.

After filing at least two notices of appearance and unsuccessfully attempting to obtain a waiver of the application fee, Perrier-Bilbo filed a second application for naturalization and paid the corresponding $680 in fees in December 2014. USCIS granted the application in August 2015. Perrier-Bilbo's naturalization ceremony was ultimately scheduled for April 2017 at the U.S. District Court for the District of Massachusetts. On the day of the ceremony, Perrier-Bilbo tried to explain her objection to the oath. When informed that she "d[id not] have to say anything," she replied, "[i]f I participate, I feel I am violating the Constitution I am supposed to support and defend." Perrier-Bilbo was told she would not be sworn in that day and that she

should speak with USCIS directly.  That same day, both Perrier-Bilbo and her lawyer spoke with an individual at the Boston USCIS office.

In August 2017, USCIS sent a letter to Perrier-Bilbo informing her that she was scheduled to participate in the upcoming September 2017 naturalization ceremony.  The letter also acknowledged her request to "take an oath of allegiance modified for religious or conscientious objections" and reiterated that the two accommodations previously proposed were still available to her, but that the district court administering the oath "w[ould] not modify the oath of allegiance for the applicants who ha[d] not requested such a modification."  Perrier-Bilbo did not go to the September 2017 naturalization ceremony.

## B.  Procedural History

On November 2, 2017, Perrier-Bilbo filed a complaint in the U.S. District Court for the District of Massachusetts against the Government.[2]  The complaint alleged that the inclusion of the phrase "so help me God" in the naturalization oath as set forth in 8 C.F.R. § 337.1 violated (1) the Establishment Clause; (2) the Free Exercise Clause; (3) the RFRA; (4) the equal protection

---

[2]  Perrier-Bilbo originally named the U.S. Congress as a party in the district court matter, but voluntarily dismissed her claims against it on May 8, 2018.

-7-

component of the Fifth Amendment's Due Process Clause; and (5) procedural due process under the Fifth Amendment's Due Process Clause. Specifically, Perrier-Bilbo, who describes herself as "an Atheist who specifically denies the existence of any 'God,'" claimed that by adding "so help me God" to the end of the oath, the United States "[was] asserting that God exists." According to her, although the regulations allow for the oath to be altered, she would still be violating her oath to "support and defend the Constitution and the laws of the United States of America" because those laws do not permit the government to make her an "outsider" because of her religious beliefs or force her to use an alternative oath. The complaint sought a declaration that keeping the phrase "so help me God" in the naturalization oath violated the above-mentioned constitutional provisions and statute. It also requested the district court to permanently enjoin the Government "from placing 'so help me God' in future naturalization oath ceremonies" and to order the Government to reimburse Perrier-Bilbo for the cost of her second naturalization application fees.

On February 22, 2018, the Government filed a motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim. The district court heard oral argument on the motion on May 8, 2018. During the hearing, the court obtained the parties'

consent to convert the motion to dismiss into cross-motions for summary judgment, as it appeared to the court that it "ha[d] the necessary facts" and "nothing[ was] in dispute." On September 28, 2018, the district court issued a memorandum and order granting summary judgment for the Government. Perrier-Bilbo v. United States, 346 F. Supp. 3d 211 (D. Mass. 2018). First, the district court, while recognizing that the phrase "so help me God" had "some religious content," id. at 221, rejected Perrier-Bilbo's Establishment Clause claim, finding that "the use of the phrase . . . or similar invocations in public oaths and statements is, along with legislative prayer, a well-established tradition that can be traced back to the nation's founding," id. at 219. Moreover, the court noted that the Supreme Court has upheld "more sectarian" "religious invocations" than the phrase at issue here, id., and that the accommodations offered to Perrier-Bilbo were "permissible, non-coercive alternatives," id. at 220. In addition, it highlighted the "overwhelmingly consistent precedent and dicta" upholding the constitutionality of similar practices. Id.

The district court then turned to the Free Exercise Clause challenge. Relying on Freedom From Religion Foundation v. Hanover School District, 626 F.3d 1 (1st Cir. 2010),[3] the court

_____

[3] In Freedom From Religion Foundation, we held that a New Hampshire

-9-

found that "mere exposure" to the phrase "so help me God" would not have a coercive effect on, or compel, Perrier-Bilbo to affirm a religious belief she does not hold, especially when USCIS offered two alternatives to avoid using the phrase.  Perrier-Bilbo, 346 F. Supp. 3d at 221.  The court further noted that even if Perrier-Bilbo had not been offered a private ceremony, simply remaining silent at the public ceremony would not amount to Perrier-Bilbo agreeing with the phrase recited by her peers.  Id.

Furthermore, the court determined that the naturalization oath comported with RFRA.  Id. at 222.  To that end, it found that because USCIS had offered Perrier-Bilbo two alternatives to avoid reciting "so help me God," the Government did not impose a "'substantial pressure' on her to violate her beliefs."  Id.  The court also noted that the mere inconvenience that would result from Perrier-Bilbo either remaining silent during the contested phrase or attending a private ceremony did not rise to the level of a substantial burden on her religious beliefs.  Id.

The district court similarly rejected Perrier-Bilbo's claim that the naturalization oath violated the Fifth Amendment's

---

statute that required public schools to provide a period during the school day when students could voluntarily recite the Pledge of Allegiance passed the constitutional muster of the First and Fourteenth Amendments.  626 F.3d at 3—4.

Due Process Clause or its equal protection component.  Id. at 223. Specifically, the court found that the oath did not treat any class of people differently or give preferential treatment to any religion, particularly in light of the regulation's provision that allows for the alteration of the oath for those who do not wish to say the words "so help me God."  Id.  Finally, the court held that, because Perrier-Bilbo did not identify a protected liberty or property interest of which she had been deprived, her procedural due process claim also failed.  Id.  Accordingly, the court granted summary judgment on all claims.  Id.

On October 29, 2018, Perrier-Bilbo filed a post-judgment motion seeking the reimbursement of the $680 she paid for the second naturalization form.[4]  She claimed that Director Haydon's "arbitrary refusal" to inform her that her lawyer needed to submit a notice of appearance -- despite having received multiple letters from her lawyer -- followed by the denial of the first naturalization application as abandoned amounted to a procedural due process violation.  Perrier-Bilbo attributed Director Haydon's conduct to an "anti-Atheistic bias."  The district court denied the motion on October 30, 2018, noting that because the Government

---

[4]  Because the court had not ruled on this matter in either its memorandum and order granting summary judgment or the entry of that judgment, Perrier-Bilbo filed this motion pursuant to Federal Rules of Civil Procedure 52(b) and/or 59(e).

had "prevailed, there [was] no occasion for reimbursement." Perrier-Bilbo filed a timely appeal of this denial and the grant of summary judgment.

## II. **Discussion**

**A. Granting of Summary Judgment**

We review a district court's grant of summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). This standard of review remains "unaltered when an appeal emerges from cross-motions for summary judgment." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018) (citing Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)). Considering each motion separately, we make "all reasonable inferences in favor of the respective non-moving party." City of Springfield, 724 F.3d at 89. When, as here, the facts are undisputed, the court simply must determine whether one of the parties is entitled to judgment as a matter of law based on those facts. Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004) (quoting Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)).

**1. Establishment Clause Claim**

The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Supreme Court precedent recognizes that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," Trump v. Hawaii, 138 S. Ct. 2392, 2417 (2018) (alteration in original) (quoting Larson v. Valente, 456 U.S. 228, 244 (1982)), nor can the government prefer religion over nonreligion, see Marrero-Méndez v. Calixto-Rodríguez, 830 F.3d 38, 44 (1st Cir. 2016) ("As conceived, the organizing principle of the Establishment Clause is 'governmental neutrality' -- between 'religion and nonreligion,' as well as among religions." (quoting McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 860 (2005))). "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" Cty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 593-94 (1989) (quoting Lynch v. Donnelly, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)).

In evaluating the Establishment Clause challenge, the district court looked to the historical and traditional practice of using phrases like "so help me God" in public oaths and statements to uphold the constitutionality of the phrase in the naturalization oath. Perrier-Bilbo argues that whether the use of the phrase is rooted in history and tradition is not a legitimate way to assess if the oath in its current form is constitutional. Supreme Court Establishment Clause jurisprudence, however, supports the district court's analysis of the challenge by reference to historical practices and understanding.

Individual Justices have hinted that history plays a significant role in interpreting the Establishment Clause and determining whether a challenged action complies with it. See, e.g., Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 26–29 (2004) (Rehnquist, C.J., concurring in judgment) (discussing various "patriotic invocations of God and official acknowledgments of religion's role" throughout the United States' history); id. at 37 (O'Connor, J., concurring) ("[I]n examining whether a given practice constitutes an instance of ceremonial deism, its 'history and ubiquity' will be of great importance."); Cty. of Allegheny, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part) ("[T]he meaning of the [Establishment] Clause is to be determined by reference to historical practices and

-14-

understandings."). Similarly, in Marsh v. Chambers, the Supreme Court, tasked with assessing the constitutionality of a state's practice of beginning a legislative session with a prayer, acknowledged that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country," and proceeded to summarize some of that history. 463 U.S. 783, 786-89 (1983). Although the Marsh Court held that historical patterns alone were insufficient to justify contemporary violations of the Establishment Clause, it found "far more" than mere historical patterns present in that case, noting the "unique history" that spoke to the intent of those who drafted the Establishment Clause, which led the Court to ultimately uphold the prayer practice. Id. at 790-91.

Recent developments in Establishment Clause jurisprudence, however, suggest that the mere presence of a historical pattern now carries more weight. In Town of Greece v. Galloway, the Supreme Court stated that "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" 572 U.S. 565, 576 (2014) (quoting Cty. of Allegheny, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part)). The Supreme Court found it unnecessary to "define the precise boundary of the Establishment

-15-

Clause where history shows that the specific practice is permitted." Id. at 577. It upheld a town's practice of holding a nondiscriminatory prayer before a town council meeting, finding that it "fi[t] within the tradition long followed in Congress and the state legislatures."[5] Id.

Most recently in American Legion v. American Humanist Association, the Supreme Court assessed an Establishment Clause challenge using a framework that looked to longstanding historical practices and significance. 139 S. Ct. 2067, 2074 (2019) (holding that "the adoption of the cross as [a] memorial must be viewed in [its] historical context"). The American Legion Court had to decide whether the Bladensburg Peace Cross -- a thirty-two-foot-tall Latin cross erected in 1925 as a World War I memorial, located on public land, and maintained by public funds -- violated the Establishment Clause. Id. at 2074, 2077. Relying entirely on a thorough analysis of the cross as a historical symbol (and of the erection of the Bladensburg Cross in

---

[5] Perrier-Bilbo unconvincingly avers that Town of Greece is inapposite to her case and faults the district court for relying on it. However, not only did the district court rely primarily on Town of Greece for fairly broad propositions of law that transcend Perrier-Bilbo's attempts to distinguish her case, but the two cases are in fact quite similar. In both cases, the non-adherent plaintiffs were not forced to participate in the contested practice because they could opt out, and they could not allege more than mere exposure to the language at issue.

particular), it concluded that the monument complied with the Establishment Clause. Id. at 2085-90. The Court reasoned that the cross, though a symbol of Christianity, had taken on a secular meaning in many contexts, id. at 2074, and that many Americans during and immediately after World War I came to associate the image of a simple white cross with memorializing those who died in the war, id. at 2075-76. Thus, "the image used in the Bladensburg memorial . . . also took on new meaning after World War I." Id. at 2075. Similarly, the Court found that the cross had, "with the passage of time," "acquired historical importance." Id. at 2089. Ultimately, it concluded that, even though the cross is "undoubtedly a Christian symbol," "that fact should not blind us to everything else that the Bladensburg Cross has come to represent." Id. at 2090.

The American Legion Court also explicitly rejected the application of the three-pronged test pronounced in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971) (requiring that a law "have a secular legislative purpose," that its "principal . . . effect . . . be one that neither advances nor inhibits religion," and that it does not "foster 'an excessive government entanglement with religion,'" (citations omitted)), to evaluate Establishment Clause challenges in cases involving "the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with

-17-

religious associations" and "certain references to, and invocations of, the Deity in the public words of public officials [and] the public references to God on coins, decrees, and buildings."[6]  Id. at 2080–81.  Rather, the Supreme Court adopted "a presumption of constitutionality" for religiously expressive "longstanding monuments, symbols, and practices."  Id. at 2082. In reaching that holding, it provided four reasons why the application of a presumption of constitutionality was better suited for these situations than the Lemon test:  (1) when

_____

[6]  This departure from the Lemon test is not inconsistent with how the Supreme Court has evaluated Establishment Clause cases in the past using a variety of measures and frameworks, recognizing that the framework must suit the facts of the case.  See Salazar v. Buono, 559 U.S. 700, 721 (2010) (noting that an Establishment Clause challenge should be "assessed in the context of all relevant factors"); Lee v. Weisman, 505 U.S. 577, 597 (1992) ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one."); Newdow v. Roberts, 603 F.3d 1002, 1017 (D.C. Cir. 2010) (Kavanaugh, J., concurring in judgment) ("[T]he Supreme Court's Establishment Clause jurisprudence does not set forth a one-size-fits-all test.  Rather, the Court ordinarily analyzes cases under various issue-specific rules and standards it has devised." (internal citations omitted)).  Notably, the Supreme Court has held that the Lemon factors were "no more than helpful signposts," Hunt v. McNair, 413 U.S. 734, 741 (1973), and it has "either expressly declined to apply the test or has simply ignored it" in several cases, Am. Legion, 139 S. Ct. at 2080 (compiling cases); see also Van Orden v. Perry, 545 U.S. 677, 686 (2005) ("Many of [the Supreme Court's] recent cases simply have not applied the Lemon test." (citing Zelman v. Simmons-Harris, 536 U.S. 639 (2002) and Good News Club v. Milford Cent. Sch., 533 U.S. 98 (2001))).  Indeed, the American Legion Court expressed that the Supreme Court has "taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance." Am. Legion, 139 S. Ct. at 2087.

-18-

monuments, symbols, or practices were originally established long ago, "identifying their original purpose or purposes may be especially difficult"; (2) with the passage of time, "the purposes associated with an established monument, symbol, or practice" and the reasons for maintaining them "often multiply"; (3) the message conveyed by the monument, symbol, or practice may evolve over time and "[t]he community may come to value them without necessarily embracing their religious roots"; and (4) when the monument, symbol, or practice has become familiar and of historical significance, "removing it may no longer appear neutral" but "aggressively hostile to religion." Id. at 2081-85. Finally, the Supreme Court suggested that the presumption could be overcome by a showing of discriminatory intent in the decision to maintain the challenged practice or by a showing of "deliberate[] disrespect[]" by that practice on the basis of religion. See id. at 2074, 2089.

We follow the Supreme Court's most recent framework and apply American Legion's presumption of constitutionality to the phrase "so help me God" in the naturalization oath because we consider the inclusion of similar words to be a ceremonial, longstanding practice as an optional means of completing an oath.[7]

---

[7] We have evaluated Establishment Clause challenges under three analytical approaches espoused by the Supreme Court: (1) the three-pronged Lemon test already described; (2) the "endorsement"

And because the record does not demonstrate a discriminatory intent in maintaining those words in the oath or "deliberate disrespect" by the inclusion of the words, Perrier-Bilbo cannot overcome the presumption.[8]

In American Legion, the Supreme Court held that the presumption of constitutionality applies to "established, religiously expressive monuments, symbols, and practices." Id. at 2085. As the district court recognized, there is an established history of invocations of God in public oaths and statements tracing back to the founding era. See Elk Grove Unified Sch.

_____

analysis fashioned in Justice O'Connor's concurrence in Lynch v. Donnelly, 465 U.S. at 688, which instructs the courts to determine whether the challenged action "has the effect of endorsing or disapproving religious beliefs," Cty. of Allegheny, 492 U.S. at 597; and (3) the coercion analysis employed in Lee v. Weisman, where the Supreme Court held that "the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise," 505 U.S. at 587. See Freedom From Religion Found., 626 F.3d at 7 (outlining the three analytical approaches in Establishment Clause challenges). But none of these analytical approaches apply in the case at hand because, as we find today, it is more properly analyzed through the American Legion lens.

[8] Our reasoning permissibly differs from that of the district court, whose opinion pre-dated the Supreme Court's holding in American Legion. When reviewing de novo, "[w]e are at liberty to affirm a district court's judgment on any ground made manifest by the record, whether or not that particular ground was raised below." United States v. George, 886 F.3d 31, 39 (1st Cir. 2018) (citing United States v. Zorrilla-Echevarría, 723 F.3d 298, 300 (1st Cir. 2013)). We also note that American Legion post-dated the briefing in this case and therefore, the parties' briefs do not discuss how that case might apply.

Dist., 542 U.S. at 26-29 (Rehnquist, C.J., concurring in judgment) (listing examples of "patriotic invocations of God and official acknowledgements of religion's role in our Nation's history," including in presidential speeches, statements, and proclamations); Newdow v. Roberts, 603 F.3d 1002, 1018 (D.C. Cir. 2010) (Kavanaugh, J., concurring in judgment) (noting that the "use of 'so help me God' in oaths for government officials is deeply rooted in the Nation's history and tradition" and observing that "[s]tate constitutions in effect at the ratification of the First Amendment similarly included 'so help me God' in state officials' oaths of office," and those words "remain to this day a part of oaths prescribed by law at the federal and state levels"). Applicants for naturalization have taken an oath of allegiance since the first naturalization law in 1790, and the oath's language, first standardized by regulation in 1929, included the phrase "so help me God."[9] That language has been included as an option at least since 1957. See Oath of Allegiance, 22 Fed. Reg. 9,765, 9,824 (Dec. 6, 1957). Thus, we can conclude that the inclusion of the phrase "so help me God" in the

---

[9] Naturalization Oath of Allegiance to the United States of America: History, U.S. Citizenship and Immigration Servs., https://www.uscis.gov/us-citizenship/naturalization-test/naturalization-oath-allegiance-united-states-america (last updated June 25, 2014) (last accessed Mar. 20, 2020).

naturalization oath as an option and its recital as an exercise of that option should be considered an established practice.

Furthermore, the words "so help me God" in the oath are religiously expressive. We have acknowledged before that the phrase "under God" has "some religious content" that cannot be "deplete[d]" by the simple act of repetition of the phrase in secular ceremonies. Freedom From Religion Found., 626 F.3d at 7. In Freedom From Religion Foundation, we recognized that "[a] belief in God is a religious belief," and the phrase "under God" had religious content because "those who are religious, as well as those who are not, could reasonably be offended by the claim that" the phrase lacked religious content. Id. (citing Myers v. Loudoun Cty. Pub. Sch., 418 F.3d 395, 407 (4th Cir. 2005)). Following that reasoning, the phrase "so help me God" at issue here certainly is religiously expressive too. This, however, does not mean the religiously expressive phrase cannot also pass Establishment Clause muster. See id. at 7-8 ("That the phrase 'under God' has some religious content, however, is not determinative of [a challenged statute's] constitutionality. This is in part because the Constitution does not 'require complete separation of church and state.'" (quoting Lynch, 465 U.S. at 673)); see also Van Orden v. Perry, 545 U.S. 677, 690 (2005) (holding that "[s]imply having religious content or promoting a message consistent with a

religious doctrine does not run afoul of the Establishment Clause" (citing Lynch, 465 U.S. at 680, 687)).

Because the inclusion of the religiously expressive phrase "so help me God" in the naturalization oath as an option for completing it follows the pattern of an established practice, we conclude that it triggers the "strong presumption of constitutionality." Am. Legion, 139 S. Ct. at 2085.

Moreover, this case satisfies each of the four justifications for applying the presumption laid out in American Legion.[10] First, aspiring United States citizens have recited the naturalization oath with the words "so help me God" for at least ninety years, but we cannot pinpoint the specific reason for the inclusion of the phrase. Perhaps it was to mirror other official oaths, like those for government officials, or perhaps the inclusion of the phrase as an option would appear to follow in the tradition of "recogni[zing] . . . the important role that religion plays in the lives of many Americans." Id. at 2089. Nevertheless, discerning the original purpose here presents the kind of difficulty American Legion contemplated.

---

[10] We do not read American Legion to require that the four justifications be met in every case. They merely "counsel" toward application of the presumption. See id. at 2081-82.

The second and third justifications are also present here where the purpose of including and maintaining the phrase "so help me God" as an option in the oath for nearly a century, and the message conveyed by its recitation, have likely multiplied and evolved over time.  See id. at 2082-84.  "Even if the original purpose of [the phrase] was infused with religion, the passage of time may obscure that sentiment."  Id. at 2083.  Different people may have different reasons for wanting to preserve the phrase in the oath.  Just as the words might not mean anything to some people, others "may come to value them without necessarily embracing their religious roots," id. at 2084, and others yet might read them as acknowledging "the centrality of faith" in their lives, id. at 2086.  See Elk Grove Unified Sch. Dist., 542 U.S. at 26 (Rehnquist, C.J., concurring in judgment) ("To the millions of people who regularly recite the Pledge, . . . 'under God' might mean several different things . . . .  How much consideration anyone gives to the phrase probably varies, since the Pledge itself is a patriotic observance focused primarily on the flag and the Nation, and only secondarily on the description of the Nation.").  It is also important to note that the phrase "so help me God" only makes up four words out of the 140-word oath, and American Legion instructs that we must view the challenged practice and consider the overall message conveyed by it against the context in which it

appears. Am. Legion, 139 S. Ct. at 2074-78. The existence of multiple purposes and meanings for the phrase within the oath is further highlighted by the fact that the regulations allow for the alteration of the oath for those who do not wish to say the disputed phrase. See 8 C.F.R. § 337.1(b). Thus, as in American Legion, despite the inclusion of a religiously expressive phrase in the oath, its repetition for the past ninety years, coupled with the ability to alter the oath, shows that the practice of permitting the religious phrase to be used to complete the oath has a secular end, and society may have preserved the practice "for the sake of [its] historical significance or [its] place in a common cultural heritage." Am. Legion, 139 S. Ct. at 2083.

Finally, just as the American Legion Court suggested, requiring the removal of the phrase "so help me God" from the naturalization oath may "strike many as aggressively hostile to religion," id. at 2085, and that lack of neutrality would not comport with the Establishment Clause, see Van Orden, 545 U.S. at 683–84 (noting that we should "neither abdicate our responsibility to maintain a division between church and state nor evince a hostility to religion by disabling the government from in some ways recognizing our religious heritage"). As we already noted, the phrase "so help me God" in the naturalization oath fits within the tradition of ceremonial references to God as an optional means

-25-

of completing an oath. Furthermore, the oath has seemingly gone unchallenged on the ground that it includes the objectionable phrase. This suggests that "few individuals . . . are likely to have understood [the inclusion of "so help me God" in the naturalization oath] as amounting . . . to a government effort to favor a particular religious sect [or] to promote religion over nonreligion." Id. at 702 (Breyer, J., concurring in judgment). Thus, by removing the language we "may no longer appear neutral," Am. Legion, 139 S. Ct. at 2084, and we may even encourage future disputes over similar longstanding language in practices across the United States, see Van Orden, 545 U.S. at 704 (Breyer, J., concurring in judgment).

Having established that all four considerations are present in this case, we are confident that it fits squarely within the American Legion framework and that the presumption of constitutionality applies. Thus, we turn to the record to determine whether Perrier-Bilbo can overcome the presumption. After careful review, we believe she is unable to do so.

We cannot discern any discriminatory intent in the decision to maintain the phrase "so help me God" in the naturalization oath, or, alternatively, a "deliberate[] disrespect[]" by the recitation of the oath on the basis of religion. See Am. Legion, 139 S. Ct. at 2074, 2089. To challenge

-26-

the district court's opinion, Perrier-Bilbo offered: (1) a single webpage challenging the validity of the proposition that George Washington actually spoke the phrase "so help me God" when taking his first oath of office; (2) evidence about the general intent of the Framers to keep Church and State separate; and (3) a claim that the nation's first statute "involved the affirmative removal of the two references to God in the oath" taken by members of Congress. Undermining a single source of historical evidence, however, does not negate the existence of an otherwise credible historical pattern; nor does offering evidence that speaks against the inclusion of the language in one particular oath, or other general evidence about the importance of separation of Church and State. Perrier-Bilbo also makes the conclusory assertion that the phrase "so help me God" is "facially religiously discriminatory" and "a purely religious phrase inserted by Monotheistic Supremacists because it makes them feel good to have the government advocate for their religious ideals." But she presents no evidence to suggest that the Government has retained the phrase in the oath for any discriminatory reasons or that the oath deliberately disrespects individuals based on religion, especially in light of the fact that the oath can be modified for those who oppose reciting the phrase "so help me God."

Ultimately, the record does not demonstrate discriminatory intent or deliberate disrespect by the inclusion and recitation of "so help me God" in the naturalization oath, and Perrier-Bilbo cannot overcome American Legion's presumption of constitutionality. Accordingly, we hold that, under the most recent framework used to evaluate whether established practices with religious content violate the Establishment Clause, the phrase "so help me God" in the naturalization oath as a means of completing that oath does not violate the Constitution. We find, in turn, that the district court correctly dismissed Perrier-Bilbo's Establishment Clause claim.

## 2. Free Exercise Claim

We now consider whether the phrase "so help me God" in the oath violates the Free Exercise Clause of the First Amendment. The Free Exercise Clause guarantees that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. The Free Exercise Clause prohibits the government from "(1) compel[ling] affirmation of religious beliefs; (2) punish[ing] the expression of religious doctrines it believes to be false; (3) impos[ing] special disabilities on the basis of religious views or religious status; or (4) lend[ing] its power to one side or the other in controversies over religious authorities or dogma." Freedom From Religion Found., 626 F.3d at

14 (quoting Parker v. Hurley, 514 F.3d 87, 103 (1st Cir. 2008)).[11]

A plaintiff alleging a Free Exercise violation must show that a government action has a coercive effect on her religious practice. Parker, 514 F.3d at 103 (quoting Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223 (1963)).

Perrier-Bilbo first faults the district court for relying on Parker v. Hurley[12] because, according to her, that case applies to "generally applicable, religion-neutral laws," and here the phrase "so help me God" is a religious phrase espousing a "particular religious view."  She contends that strict scrutiny should apply instead.  But her argument is unavailing because the practice of permitting the naturalization oath to be completed with religious language, as we indicated above, is indeed neutral as a whole and of general applicability, and such laws "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  Church of the Lukumi Babalu Aye, Inc. v. City of

---

[11]  We refer to these prohibitions as the "Parker prohibitions."

[12]  514 F.3d 87 (1st Cir. 2008) (affirming dismissal of lawsuit brought by parents against a school system claiming that an elementary school violated their constitutional rights by exposing their children to books portraying different kinds of families, including same-sex couples).

Hialeah, 508 U.S. 520, 531 (1993) (citing Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 883 (1990)).

A law that "infringe[s] upon or restrict[s] practices because of their religious motivation" or "refers to a religious practice without a secular meaning discernable from the language or context" is not a neutral law. Id. at 533 (citing Smith, 494 U.S. at 878-79). While the phrase "so help me God" has a religious connotation, there is no evidence that it was included as an option in the oath to target or suppress religious beliefs. Nor can we discern that this option creates any "covert suppression of particular religious beliefs," id. at 534 (quoting Bowen v. Roy, 476 U.S. 693, 703 (1986)), especially given the available accommodations. Because we find that the oath is neutral and of general applicability, we conclude that the district court did not err in relying on Parker, as that case sets forth the applicable framework to evaluate the free exercise claim.

We agree with the district court that Perrier-Bilbo's free exercise claim fails because she has not demonstrated that the Government has coerced her into violating or changing her religious beliefs or practices. We also find that none of the prohibitions set forth in Parker are of concern in this case.[13]

---

[13] Perrier-Bilbo concedes that the second Parker prohibition -- that the government may not "punish the expression of religious doctrines it believes to be false," Parker, 514 F.3d at 103 -- is

-30-

To begin, the Government has not imposed a requirement that Perrier-Bilbo "agree with or affirm" the phrase "so help me God." Freedom From Religion Found., 626 F.3d at 14 (quoting Parker, 514 F.3d at 106).  Nor does she develop an argument to the contrary that accounts for the option of remaining silent.  Nevertheless, Perrier-Bilbo argues that she would still be compelled to affirm a religious belief she does not share if she were to take part in an oath ceremony where the phrase is used by others.  Mere exposure to different religious ideas, however, does not prevent Perrier-Bilbo from ascribing to or pursuing her own beliefs.  See Town of Greece, 572 U.S. at 590 ("But in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate." (citing Cty. of Allegheny, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part))); see also Freedom From Religion Found., 626 F.3d at 14 ("Because the Doe children allege mere exposure to the religious content of the Pledge, they cannot state a claim under the Free Exercise Clause, nor can their parents, as 'the mere fact that a child is exposed on occasion . . . to a concept offensive to a parent's religious belief does not inhibit the parent from

_____

not relevant to this case.

-31-

instructing the child differently.'" (quoting Parker, 514 F.3d at 105)). Thus, Perrier-Bilbo cannot establish a free exercise violation arising out of her exposure to other soon-to-be-citizens' recital of the naturalization oath containing the phrase to which she personally objects.

Additionally, Perrier-Bilbo argues that the Government "has imposed the special disability that keeps her from being an equal in the naturalization oath ceremony" because of her beliefs. But the reason Perrier-Bilbo has not yet secured citizenship is because of her demand that the Government modify the ceremony for everyone else -- including for those who have not requested this modification -- so that she can adhere to her own beliefs. The Government is not required to further Perrier-Bilbo's spiritual development or conform to her religious beliefs. See Bowen, 476 U.S. at 699 ("The Free Exercise Clause simply cannot be understood to require the [g]overnment to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.").

Perrier-Bilbo also contends that the Government has violated the last Parker prohibition by "lending its power to the side that believes that God exists." But having found that the oath complies with the Establishment Clause, her claim that the

inclusion of the phrase "so help me God" signifies governmental favoritism of theism is unpersuasive.

Finally, while Perrier-Bilbo acknowledges that she does not have to utter the words "so help me God," she still finds that her religious beliefs are disrespected if she participates in a ceremony in which others recite the phrase. We do not second-guess the sincerity of Perrier-Bilbo's beliefs or her feeling of distress upon hearing the phrase at issue. But even if the phrase offends her, offense "does not equate to coercion," Town of Greece, 572 U.S. at 589, and the Free Exercise Clause does not entitle her to a change in the oath's language as it pertains to others, see Elk Grove Unified Sch. Dist., 542 U.S. at 44 (O'Connor, J., concurring) ("[T]he Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree."); see also Bowen, 476 U.S. at 700 ("[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." (alteration in original) (quoting Sherbert v. Verner, 374 U.S. 398, 412 (1963) (Douglas, J., concurring))). Accordingly, her free exercise claim fails.

### 3. The Religious Freedom Restoration Act Claim

We now turn to whether the inclusion of the phrase "so help me God" in the naturalization oath violates RFRA.

Perrier-Bilbo contends that RFRA provides greater protection than the Free Exercise Clause of the First Amendment. Under this broader protection, Perrier-Bilbo believes that we must acknowledge her sincere belief in atheism and find that the Government's inclusion of the phrase "so help me God" in the naturalization oath has forced her to choose between beginning her citizenship "as an equal among her co-participants at the price of violating her sincerely held religious beliefs" and "freely exercising her religious beliefs at the price of sacrificing the ability to start off her American citizenship . . . as an equal among her co-participants." She argues that the inclusion of that phrase "substantially burdens her free religious exercise."

RFRA, as Perrier-Bilbo appropriately contends, offers "very broad protection for religious liberty." Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 693 (2014). It prohibits the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). A plaintiff alleging a RFRA claim has the initial burden of establishing a prima facie

case by showing that the application of the challenged law substantially burdens a sincere religious exercise. See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006). While "substantial burden" is not defined in RFRA, case law counsels that a substantial burden on one's exercise of religion exists "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 717-18 (1981); see also Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1069-70 (9th Cir. 2008) ("Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or [are] coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions.").

The district court found that, in light of the two options afforded to Perrier-Bilbo to avoid the phrase, the Government has not put "substantial pressure" on her to violate her sincere beliefs in order to naturalize. And Perrier-Bilbo's argument that she was forced or pressured to choose between following the tenets of her religion and receiving the benefit of

naturalization fails to account for the option she was given of remaining silent because she can naturalize without saying the phrase that violates her religious beliefs, or even without hearing it spoken if she naturalizes in a private ceremony. Nor does she argue that she is being penalized for practicing her religious beliefs. The Government has provided her with options so that she can adhere to her religious beliefs while still taking the naturalization oath, be it with the rest of the prospective citizens or in a private ceremony. The Government has only stopped Perrier-Bilbo from imposing her religious mandates on others. See Navajo Nation, 535 F.3d at 1063-64 (describing as problematic the idea that, without a "substantial burden," RFRA would give each citizen an individual veto when a practice offended his religious beliefs or sensibilities, despite depriving others of a governmental benefit).

While she might find the options offered by the Government subjectively burdensome, however, the district court was right to conclude that not every imposition or inconvenience rises to the level of a "substantial burden." See Gary S. v. Manchester Sch. Dist., 374 F.3d 15, 21-22 (1st Cir. 2004) (finding that a government program imposed no cognizable burden for the purposes of RFRA despite the plaintiffs' belief that such program violated their free exercise rights); New Doe Child #1 v. United

-36-

States, 901 F.3d 1015, 1026-27 (8th Cir. 2018) (finding that "not all burdens constitute substantial burdens" and "mere inconvenience" does not always amount to a substantial burden); New Doe Child #1 v. Congress of U.S., 891 F.3d 578, 590 (6th Cir. 2018) (finding that a substantial burden must be "more than a 'mere inconvenience'"); Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1121 (9th Cir. 2000) (same).  Because we find that Perrier-Bilbo failed to establish that the Government imposed a substantial burden on her exercise of religion, our RFRA analysis ends here.

**4.  Equal Protection Under the Fifth Amendment Claim**

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."  United States v. Windsor, 570 U.S. 744, 774 (2013).  That Clause prohibits the government from "invidiously discriminating between individuals or groups."  Washington v. Davis, 426 U.S. 229, 239 (1976) (citing Bolling v. Sharpe, 347 U.S. 497 (1954)).  To establish an equal protection claim, a plaintiff must show that, "compared with others similarly situated, the plaintiff was treated differently because of an improper consideration, such as his religion."[14]  Kuperman

---

[14]  We evaluate Fifth Amendment equal protection claims under the same standards as equal protection claims under the Fourteenth Amendment.  Adarand Constructors, Inc. v. Pena, 515 U.S. 200,

-37-

v. Wrenn, 645 F.3d 69, 77-78 (1st Cir. 2011) (citing Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004)).

Invoking the Fifth Amendment's equal protection guarantees, Perrier-Bilbo asserts that offering her a separate, private ceremony in which the oath would not contain the phrase "so help me God" violates the principle that "separate . . . facilities are inherently unequal." She equates the accommodations the Government offered her to the segregation policies at issue in Plessy v. Ferguson, 163 U.S. 537 (1896), and those struck down in Brown v. Board of Education, 347 U.S. 483 (1954).

Despite her efforts, Perrier-Bilbo fails to show that, based on her religion, she was treated differently from other similarly situated prospective citizens with regards to the recital of the naturalization oath. Indeed, the regulation providing the language of the oath does not "'require different treatment of any class of people because of their religious beliefs,' nor does it 'give preferential treatment to any

217-18 (1995); see also United States v. Paradise, 480 U.S. 149, 166 n.16 (1987) (noting that "the reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth"); Buckley v. Valeo, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975) ("[The Supreme Court's] approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.").

particular religion.'" Freedom From Religion Found., 626 F.3d at 14 (quoting Wirzburger v. Galvin, 412 F.3d 271, 283 (1st Cir. 2005)). Rather, as the district court correctly reasoned, the fact that the phrase "so help me God" makes up part of the oath does not take away from the fact that the regulation "applies equally to those who believe in God, those who do not, and those who do not have a belief either way, giving adherents of all persuasions the right to participate or not participate" in reciting the naturalization oath. Perrier-Bilbo, 346 F. Supp. 3d at 223 (quoting Freedom From Religion Found., 626 F.3d at 14). The regulation requires all applicants for citizenship, regardless of their religious beliefs, to take the oath. The provision allowing applicants that do not wish to say the phrase "so help me God" for religious or other reasons to modify the language of the oath, see 8 C.F.R. § 337.1(b), further proves that the regulation applies equally to all applicants.

Moreover, Perrier-Bilbo's comparison of the accommodation of a separate, private naturalization ceremony to the kind of segregation policies at issue in Plessy and Brown is inapposite. Unlike those invidious segregation policies and the relegation of black people to separate facilities, designed to keep individuals of different races apart from one another, the private ceremony offered to Perrier-Bilbo was proposed as an

-39-

accommodation for her religious beliefs, after she expressed that she could not recite the phrase "so help me God" and did not want others around her to recite it either. The Government is not attempting to segregate her in any way. She is still welcome to attend the public ceremony from which she claims she is excluded and to refrain from speaking, or even engaging with, the phrase her beliefs proscribe.

In sum, because the regulation does not "create[] different rules for distinct groups of individuals based on a suspect classification," Wirzburger, 412 F.3d at 283, Perrier-Bilbo's equal protection claim fails.

## 5. Fifth Amendment's Due Process Clause Claim

Next, invoking the Fifth Amendment's Due Process Clause, Perrier-Bilbo argues that she "has a protected liberty interest in not having the law exclude her from the oath ceremony of her choice on the basis of her religious belief." The district court found below that Perrier-Bilbo had failed to establish a procedural due process claim. We agree.

Procedural due process guarantees that "before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" González-Droz v. González-Colón, 660 F.3d

-40-

1, 13 (1st Cir. 2011) (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990)).  "To state a valid procedural due process claim, a plaintiff must (1) 'identify a protected liberty or property interest,' and (2) 'allege that the defendants . . . deprived [her] of that interest without constitutionally adequate process.'"  Air Sunshine, Inc. v. Carl, 663 F.3d 27, 34 (1st Cir. 2011) (quoting González-Droz, 660 F.3d at 13).

Perrier-Bilbo fails to identify a protected "liberty interest" at issue here.[15]  We have not found, and Perrier-Bilbo does not cite, any case law that would entitle her to relief based on her alleged exclusion from the oath ceremony of her choice. While the Supreme Court has not clearly defined "liberty" in the Fifth Amendment Due Process Clause context, it has found the term not to be "confined to mere freedom from bodily restraint."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 572 n.11 (1972) (quoting Bolling, 347 U.S. at 499).  In the Fourteenth Amendment Due Process Clause context, however, "the term has received much consideration and some of the included things have been definitely stated."  Id. at 572.  Because of the aforementioned parallelism between the Due Process Clauses of the Fifth and Fourteenth Amendments, we look to the Supreme Court's interpretation of

---

[15]  In her briefing to this Court, Perrier-Bilbo did not identify or claim that any protected property interest was at play here.

"liberty" in the Fourteenth Amendment context for guidance.  See

Paul v. Davis, 424 U.S. 693, 702 n.3 (1976).

> The Supreme Court has found that the term "liberty"

>> denotes not merely freedom from bodily restraint but
>> also the right of the individual to contract, to
>> engage in any of the common occupations of life, to
>> acquire useful knowledge, to marry, establish a home
>> and bring up children, to worship God according to
>> the dictates of his own conscience, and generally to
>> enjoy those privileges long recognized . . . as
>> essential to the orderly pursuit of happiness by free
>> men.

Roth, 408 U.S. at 572 (quoting Meyer v. Nebraska, 262 U.S. 390,

399 (1923)).  Perrier-Bilbo's asserted interest comes within none

of those protected areas.  A due process claim requires that a

"'cognizable liberty or property interest be at stake,'" Rivera v.

Sessions, 903 F.3d 147, 150-51 (1st Cir. 2018) (quoting Kandamar

v. Gonzales, 464 F.3d 65, 69 (1st Cir. 2006)), and none is present

here.  Although the Due Process Clause may protect her ability to

"worship God according to the dictates of [her] own conscience,"

Roth, 408 U.S. at 572 -- a protection which presumably encapsulates

Perrier-Bilbo's right not to worship any god -- the Government has

not prevented Perrier-Bilbo from expressing her atheistic

religious beliefs. Nor can Perrier-Bilbo claim that the regulation

prescribing the oath prohibits her from having a public ceremony

during which she does not have to say the phrase "so help me God."

Rather, the regulations enable her to alter the oath, and the

-42-

Government has given her alternatives to accommodate her beliefs so that she is comfortable during her ceremony and is able to naturalize. Perrier-Bilbo's actual complaint seems to be that the Government will not change the oath for everyone attending the public ceremony so that no one utters the words to which Perrier-Bilbo objects. Perrier-Bilbo certainly does not have a protected liberty interest in that.

Finding no protected liberty or property interest to be implicated, we hold that the district court correctly denied Perrier-Bilbo's procedural due process claim. Our conclusion makes it unnecessary to address whether any deprivation occurred without constitutionally adequate process. See Hewitt v. Helms, 459 U.S. 460, 472 (1983); Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 534 (1st Cir. 1995).

## B. Reimbursement of Application Fee

After the district court entered summary judgment for the Government, Perrier-Bilbo filed a post-judgment motion pursuant to Fed. R. Civ. P. 52(b) and 59(e)[16] in which she sought the reimbursement of the $680 application fee she paid for her second naturalization form. In the motion, Perrier-Bilbo attempts

---

[16] Rule 52(b) provides for a motion to amend or make additional findings, see Fed. R. Civ. P. 52(b), and Rule 59(e) provides for a motion to alter or amend a judgment, see Fed. R. Civ. P. 59(e).

to make out a procedural due process violation stemming from USCIS Director Haydon's conduct in response to Perrier-Bilbo's objections to the oath, and the director's handling and subsequent designation of her application as abandoned. Perrier-Bilbo argued that such a violation of "basic" due process required the reimbursement of the second application fee. The district court denied the motion, only noting that the Government had prevailed and Perrier-Bilbo was not entitled to reimbursement. Perrier-Bilbo's argument on appeal reiterates that Director Haydon's alleged failure to communicate with her or her attorney, along with the handling and eventual designation of her first application for naturalization as abandoned, amounts to a due process violation. We decline to consider this argument because we find it is not properly before us.

Perrier-Bilbo's complaint contained a claim that a procedural due process violation had occurred, but she alleged and later argued in opposition to the Government's motion to dismiss that the violation arose from the requirement to take the oath with the words "so help me God." While we acknowledge that her complaint alleged and described the facts surrounding her and her attorney's interactions with Director Haydon and the denial of the application, it was not until her post-judgment motion that she

connected those allegations to a purported, additional due process violation and squarely presented the argument.

The purpose of Rules 52(b) and 59(e) is to allow the court to correct or amend a judgment in the event of any manifest errors of law or newly discovered evidence. See Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 7 n.2 (1st Cir. 2005); Nat'l Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990). Perrier-Bilbo's motion, rather than attempting to prove a manifest error of law or present newly discovered evidence, attempts to assert -- for the first time and after summary judgment issued against her -- a procedural due process claim arising from Director Haydon's conduct. We have found that reconsideration motions are "aimed at *re* consideration, not initial consideration," Harley-Davidson Motor Co. v. Bank of New England-Old Colony, N.A., 897 F.2d 611, 616 (1st Cir. 1990) (emphasis in original) (citing White v. N.H. Dep't of Emp't Sec., 455 U.S. 445, 451 (1982)), and thus, theories and arguments presented for the first time in those motions are not properly before the district court, see Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 537 (1st Cir. 2011) ("The court was . . . acting within its discretion in refusing . . . to consider new arguments that [the plaintiff] could have made earlier. A motion to reconsider should not 'raise arguments which

could, and should, have been made before judgment issued.'" (quoting <u>ACA Fin. Guar. Corp.</u> v. <u>Advest, Inc.</u>, 512 F.3d 46, 55 (1st Cir. 2008))); <u>Tell</u> v. <u>Trs. of Dartmouth Coll.</u>, 145 F.3d 417, 419-20 (1st Cir. 1998)(finding that a new theory raised in a motion for reconsideration had been waived because it "should have been proffered to the district court" earlier); <u>In re Neurontin Mktg. & Sales Practices Litig.</u> v. <u>Pfizer, Inc.</u>, 810 F. Supp. 2d 366, 368 (D. Mass. 2011) (finding that a Rule 52(b) motion may not be used "to assert new theories not raised at trial"). We also lack the benefit of the district court's fact-finding and initial examination of this claim. See <u>Clauson</u> v. <u>Smith</u>, 823 F.2d 660, 666 (1st Cir. 1987). Accordingly, we conclude that Perrier-Bilbo's claim is not properly before us.[17] See <u>Iverson</u>, 452 F.3d at 102–03 (finding that "theories not squarely and timely raised in the trial court" and failure to mention or develop a legal theory in opposition to a dispositive motion "defeat[s] [the] belated attempt to advance the theory on appeal"); <u>Tell</u>, 145 F.3d at 420 n.3 (declining to consider argument that should have been presented to the district court).

---

[17] We also note that Perrier-Bilbo's procedural due process argument on appeal as it pertains to the treatment of and communications surrounding her application is set forth in a rather conclusory manner. See <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

### III.  Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment and the denial of Perrier-Bilbo's post-judgment motion under Fed. R. Civ. P. 52(b) and 59(e).

**Affirmed.**

**"Concurring opinion follows"**

**BARRON**, <u>**Circuit Judge, Concurring**</u>.  I write separately to underscore what I understand our opinion to hold.  I am moved to do so by the Constitution's text, which, at the very least, is a good place to start in trying to figure out what it means.

The portion of that text that I have in mind is the clause that sets forth the presidential oath.  That clause does not require those completing it to avow their faith in a higher power.[18]  Consistent with the founding generation's acceptance of diverse views about religion, that clause does not even require the President-elect to "swear" an oath at all, as it expressly states that, no questions asked, an "affirm[ation]" will do just as well.  U.S. Const. art. II, § 1, cl. 8.[19]

---

[18]  The presidential oath reads:  "Before he enter on the execution of his office, he shall take the following Oath or Affirmation:-- 'I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States.'"  U.S. Const. art. II, § 1, cl. 8; <u>see also</u> U.S. Const. art. I, § 3, cl. 6 (requiring the Senate be on "Oath or Affirmation" when sitting for impeachment); U.S. Const. art. VI, cl. 3 (requiring state and federal legislators and officers to "be bound by Oath or Affirmation, to support this Constitution"); U.S. Const. amend. IV (requiring warrants to be issued only "upon probable cause, supported by Oath or affirmation").

[19]  The Framers in this way made an "affirmative accommodation of religious belief" by allowing the President-elect to swear <u>or</u> affirm, given that "[c]ertain minority religious groups, most notably the Quakers, refused on Biblical grounds to take oaths, but were willing to make affirmations."  Arlin M. Adams & Charles J. Emmerich, <u>A Heritage of Religious Liberty</u>, 137 U. Pa. L. Rev. 1559, 1630-31 & n.298 (1989).  The religious objection to swearing may be traced to the passage in the New Testament, Matthew 5:34-37,

The federal regulation that prescribes what a prospective citizen must say to become naturalized, by contrast, eschews the more neutral "swear or affirm" approach that the Constitution selects. Instead, it sets forth a default script that requires prospective citizens to manifest their loyalty to this country by swearing, "on oath," the following expression of religious faith: "so help me God." 8 C.F.R. § 337.1(a). See Newdow v. Roberts, 603 F.3d 1002, 1016 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (discussing the "religious nature of words such as 'help me God'").[20]

that reads:

> But I tell you, do not swear an oath at all: either by heaven, for it is God's throne; or by the earth, for it is his footstool; or by Jerusalem, for it is the city of the Great King. And do not swear by your head, for you cannot make even one hair white or black. All you need to say is simply "Yes" or "No"; anything beyond this comes from the evil one.

[20] Congress has specified by statute that:

> A person who has applied for naturalization shall, in order to be and before being admitted to citizenship, take in a public ceremony . . . an oath (1) to support the Constitution of the United States; (2) to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the applicant was before a subject or citizen; (3) to support and defend the Constitution and the laws of the United States against all enemies, foreign and domestic; (4) to bear true faith and allegiance to the same; and (5)(A) to bear arms on behalf of the United States when required by the law, or (B) to perform noncombatant service in

-49-

To be sure, the federal agency that administers the naturalization process, the United States Citizenship and Immigration Services ("USCIS"), does permit prospective citizens to request an accommodation from having to say those words. 8 C.F.R. § 337.1(b). But, the nature of the relief that USCIS makes available appears to render the citizenship oath, at least as presently administered, less respectful of the religious liberties of an immigrant who wishes to make herself a citizen than the Constitution is of the religious liberties of a citizen who wishes to make herself a President.

As it happens, though, the plaintiff's chief complaint in this case does not take aim at the inadequacy of the accommodations that were offered to her. Instead, she primarily contends that, notwithstanding them, the government impermissibly subjected her to a government-endorsed religious message merely by

_____

the Armed Forces of the United States when required by the law, or (C) to perform work of national importance under civilian direction when required by the law.

8 U.S.C. § 1448(a). The regulation promulgated under that statute, 8 C.F.R. § 337.1(a), sets forth specific language for the oath, and the default mechanism for how one must solemnize it. The language set forth in that regulation that is most relevant to the issues before us -- "on oath," "so help me God" -- is notably not in the statute itself:

I hereby declare, on oath, that . . . and that I take this obligation freely, without any mental reservation or purpose of evasion; so help me God.

permitting others to complete the citizenship oath in her presence with the words, "so help me God." Our opinion well explains why, given past practice, that complaint lacks merit. Indeed, the Constitution permits the President-elect to choose to "swear" to the presidential oath, and Presidents-to-be have regularly exercised that option by saying, "so help me God." See Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2074 (2019).

But, the plaintiff does make a fallback complaint, in which she contends that, due to the inadequacy of the USCIS's efforts to accommodate her concerns, the government pressured her to conform to the religiously inflected default means of completing the citizenship oath. And that contention is more promising.

In keeping with the governing federal regulations, 8 C.F.R. § 337.1(b), the USCIS offered the plaintiff here the option of either declining to participate in the public naturalization ceremony and taking the oath privately while stating that she "solemnly affirm[s]" what it says, or participating in that ceremony while refraining from saying "so help me God" when the officiant instructed the participants to do so. Id. But, I can imagine that some prospective citizens might not be comfortable asking the government to spare them from having to swear to God, especially if to obtain that relief they must be willing to demonstrate that they are entitled to it "by reason of religious

-51-

training and belief (or individual interpretation thereof), or for other reasons of good conscience." Id. And, even setting that concern aside, it also is not clear to me that the private-ceremony option is adequate, given that it appears to permit the prospective citizen to be true to herself only if she skips one of the most inspiring and moving civic ceremonies that our government sponsors. Nor is it clear to me that the remaining-silent option is adequate either, given that it places the prospective citizen in the uncomfortably conspicuous position of refusing to say "on oath" and "so help me God" while all around her are instructed by the officiant (often a federal judge) to do so.

Our decision in Freedom From Religion Foundation v. Hanover School District, 626 F.3d 1 (1st Cir. 2010), moreover, does not appear to show that the latter accommodation could be curative, even if the former could not. There, we held that "the recitation of the Pledge in public school classrooms" in New Hampshire did not unconstitutionally coerce "children to recite a purely religious ideology," notwithstanding that the Pledge referred to this nation as one that is "under God," because the school district permitted students to remain "silent during the saying of the Pledge [of Allegiance]." Id. at 10-14 (internal quotation omitted). But, there is a difference between swearing to God to become a citizen of the United States and making a pledge

that refers to God in describing the United States.  There is a difference, too, between participating in the ceremony through which one engages in the legally consequential act that transforms oneself into a United States citizen and attending an early morning homeroom in which a routine recitation is made.  Thus, the case for finding that an immigrant's public silence in the former setting would be considered conspicuous -- and reflective of her disbelief in God -- appears to me to be much stronger than the case for finding the same to be true when a high schooler chooses to stay mum while the PA system broadcasts the Pledge.  See id.

Citizenship entails, as a necessary burden, the willingness to stand up for one's rights.  It does not entail the obligation to overcome the pressure that the government exerts -- even if only indirectly, and even if only through inattention -- by leveraging the predictable human impulse to seek out the comfort of fitting in or, at least, to avoid the hassles that so often follow from choosing to stand out.  Thus, while the burden presently imposed on the individual immigrant who objects to saying "so help me God" to complete the citizenship oath may seem minimal, it should not be ignored, at least when the government could so easily avoid imposing it.

The government could require, for example, that the officiant instruct participants in the public naturalization

-53-

ceremony to make known their loyalty to this country either by making an affirmation or by making their commitment "on oath" and by saying, "so help me God." By doing so, the government would take the modest step of ensuring that officiants would no longer instruct participants in such ceremonies to make only the latter statements. And, in consequence, prospective citizens who are uncomfortable making them would no longer need to seek special permission to remain silent as the price of their admission. In fact, that revised approach would not even mark a break with tradition, as it would revert back to the practice reflected in the ready templates set forth not only in Article II, Section 1 of the Constitution but also in the 1790 statute in which Congress first prescribed how those seeking naturalization should make known their allegiance to the United States. See Naturalization Act of 1790, ch. 3, § 1, 1 Stat. 103, 103 (expressly referring to "the oath or affirmation prescribed by law, to support the constitution of the United States, which oath or affirmation such court shall administer"); see also Naturalization Act of 1795, § 2, 1 Stat. 414, 415 (stating that the prospective citizen "may be admitted to become a citizen, on his declaring on oath or affirmation").[21]

---

[21] Under the early statutes, courts administering the oath retained some flexibility as to its content. See Naturalization Oath of Allegiance to the United States of America: History, U.S.

The plaintiff here, however, in claiming that she was pressured to complete the oath by saying, "so help me God," hardly addresses the adequacy of the option to remain silent that she was given. She focuses her challenge in that regard almost exclusively on what she contends is the inadequacy of the private ceremony option. We thus must assume the adequacy of the option that was made available to her, as she does not challenge it in any developed way. For that reason, I join our opinion in full, as it does not preclude our finding merit in a different attempt by an immigrant than we confront here to enforce the right to religious liberty that has, for so long, led so many to seek citizenship in this country.

---

Citizenship & Immigr. Servs., https://www.uscis.gov/us-citizenship/naturalization-test/naturalization-oath-allegiance-united-states-america (last updated June 25, 2014). The first official standard text for the Oath of Allegiance was promulgated by regulation in 1929 and included the language, "so help me God." Id.