In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 20-1881

REBECCA WOODRING,

*Plaintiff-Appellee,*

*v.*

JACKSON COUNTY, INDIANA,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:18-cv-00243 — **Tanya Walton Pratt**, *Judge.*

———————

ARGUED NOVEMBER 12, 2020 — DECIDED FEBRUARY 2, 2021

———————

Before WOOD, HAMILTON, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* This case concerns the constitution-
ality of a nativity scene on government property. Each holi-
day season, Jackson County, Indiana allows private groups to
set up a lighted Christmas display on the front lawn of its his-
toric courthouse. The display comprises a nativity scene,
Santa Claus in his sleigh, a reindeer, carolers, and large
candy-striped poles. Rebecca Woodring, a resident of Jackson
County, sued the County to enjoin the nativity scene. In her

view, the nativity scene violates the First Amendment's Establishment Clause because it conveys the County's endorsement of a religious message. The County defends the nativity scene as part of its secular celebration of a public holiday. The district court sided with Woodring and permanently enjoined the County from displaying the nativity scene, at least in its current arrangement. The County now appeals.

We agree with the district court that Woodring has standing to sue, but we hold that the County's nativity scene complies with the Establishment Clause. The district court thought itself bound by the "purpose" and "endorsement" tests that grew out of the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). We hold, however, that the Supreme Court's recent decision in *American Legion v. American Humanist Association*, 139 S. Ct. 2067 (2019), requires us to use a different, more historical framework to gauge the constitutionality of the County's nativity scene. Applying *American Legion*, we conclude that the County's nativity scene is constitutional because it fits within a long national tradition of using the nativity scene in broader holiday displays to celebrate the origins of Christmas—a public holiday. We thus affirm the district court's ruling on standing, reverse its Establishment Clause ruling, and vacate the injunction.

## I. Background

### A. The Nativity Scene

A historic courthouse sits on Main Street in Brownstown, Indiana, the county seat of Jackson County. These days, "courthouse" is something of a misnomer for the building. In December 2018, the county courts and judicial offices relocated from the courthouse to a new Judicial Center, which sits

behind and across the street from the courthouse. The county treasurer, auditor, assessor, recorder, surveyor, planning and zoning offices, and public defender's office remain in the historic courthouse, along with a Purdue University extension program that operates in the basement. The courthouse sits in the middle of a park-like square, bordered on all sides by intersecting streets. It has a large front lawn that faces Main Street. Permanent fixtures on the front lawn include a bell, a flagpole, a tank, and a granite monument that serves as a memorial to veterans. The front lawn is on the west side of the courthouse. The Judicial Center is on its east side. The east and west sides of the courthouse have main entrances.

Every year, from around Thanksgiving to New Year's Day, a Christmas display goes up on the front lawn of the courthouse. The display—a collection of wire-framed shapes that light up from dusk to dawn—straddles a sidewalk leading from the front courthouse doors to Main Street. The display consists of a waving Santa Claus with his sleigh, a reindeer, seven large candy-striped poles, the nativity scene (also known as a crèche), and four carolers standing in front of a lamp post. Santa Claus and the reindeer are on the left edge of the display. To their right are three gift-bearing kings (Magi) and a camel, who look upon the nativity. On the right side of the sidewalk, Mary, Joseph, and infant Jesus in the stable are flanked on each side by trumpet-playing angels. To their right are several animals facing the nativity. The carolers stand in front of the animals, closer to Main Street. The tall candy-striped poles are interspersed along the back edge of the display. Here is a picture of the display at dusk:



The display has gone up each year since 2003, when the Brownstown Area Ministerial Association purchased it. Although the Ministerial Association owns the display, the local Lion's Club (a secular group) takes care of it and sets it up each year. The County supplies electricity for the display. There is evidence that the courthouse had similar displays before 2003. In 2000, the courthouse custodian borrowed a display from a local church and placed it on the front lawn. There was no display in 2001. In fact, the then-President of the County Commissioners "publicly apologized for not having a nativity scene in the Courthouse yard" that year. In 2002, the Brownstown Chamber of Commerce set up some Christmas decorations on the lawn. Since 2003, some version of the current display has gone up with the County's approval.

Before 2018, the secular elements of the display were more remote from the nativity scene, at far ends of the front lawn.

In December 2018, the Freedom From Religion Foundation sent a letter to the County demanding removal of the nativity scene on the ground that it violated the Establishment Clause. The letter prompted a rally at the courthouse, where the President of the County Commissioners spoke and other attendees said prayers. In response to the letter, the County rearranged the display into its current format so that all items, secular and non-secular, appeared in one field of view. The County intended this change to be permanent and instructed the Lions Club to preserve the same arrangement in future years, with "at least as many and as large non-religious items … placed at least as close to each other."

The display we have described and pictured above is the display that went up during the 2019 holiday season. We consider the constitutionality of that display only and not any prior iterations of it. Woodring does not challenge the pre-2018 version of the display, and she does not identify any meaningful differences between the 2018 and 2019 displays.

## B. Woodring's Objection to the Nativity Scene

Woodring lives in Seymour, Indiana, which is within Jackson County. She has lived in Jackson County since 2016. Woodring has a daycare business and a nascent t-shirt business. These businesses generate income, and Woodring pays taxes, including county taxes, on her income. Woodring is an atheist who believes that government should avoid religious activity.

Woodring often travels to and through Brownstown during her everyday activities. Starting in November 2018, Woodring had to go to the Judicial Center to handle matters related to her divorce. On one of these occasions, she entered

the courthouse by accident and was directed to the Judicial Center. Each time Woodring went to the Judicial Center, she passed by the courthouse or could see its front lawn. Woodring's divorce was granted in early 2019, but she continues to travel on Main Street past the courthouse. She goes there to engage in business, to go grocery shopping and couponing, to take day trips, to take her son to a test at least once a year, and to meet with the Jackson County Prosecutor about collecting child support. The prosecutor's office is in the Judicial Center, but Woodring sees the front lawn of the courthouse when she goes there. Except for her divorce-related trips, Woodring plans to engage in all these activities in the future, so she will continue to travel by or near the courthouse and see its front lawn.

Woodring first learned about the display in December 2018 when she read an online news story about the Freedom From Religion Foundation's demand letter. After seeing pictures of the display online, Woodring decided to go and see it in person. Wooding drove to Brownstown to visit the display and do some couponing. Woodring believes that the nativity scene in the display "celebrates Christianity" and is a "religious display on government property." She finds it offensive and "believe[s] it is improper as it forces or projects a belief onto me that I do not share and it is not the role of government to project or endorse religious beliefs." Woodring has not altered her behavior to avoid seeing the display, and she does not plan to do so in the future, "as there is really no way to travel to or through Brownstown and avoid seeing the front lawn of the Courthouse that faces Main Street."

At her deposition, Woodring testified that the whole display, including the secular items, offends her because it is all

"part of the Christmas and the whole, you know, Christianity thing." She testified that, no matter how many secular items are in the display, and no matter their arrangement, the display will offend her. She will not be satisfied unless the whole display is moved off government property.

**C. This Lawsuit**

In late December 2018, Woodring filed this lawsuit under 42 U.S.C. § 1983 against the County, alleging that the nativity scene at the historic courthouse violates the Establishment Clause. Woodring sought a declaration and permanent injunction prohibiting the County from displaying the nativity scene on the front lawn of the courthouse.

The parties cross-moved for summary judgment. Woodring moved for summary judgment on the merits. The County moved for summary judgment on standing and on the merits. The district court granted Woodring's motion for summary judgment and denied the County's motion. The court found that Woodring had standing to challenge the display because she had to come into "direct and unwelcome contact" with it while exercising her rights as a citizen of Jackson County. On the merits, the court found that the nativity scene ran afoul of the Establishment Clause. In its view, the nativity scene communicated a message of government endorsement of religion and had a religious purpose. The court thus permanently enjoined the County from displaying the nativity scene in its current arrangement on the front lawn of the courthouse.

The County now appeals the district court's summary judgment rulings. We granted the County a stay of the district court's injunction pending the outcome of this appeal. We also

allowed amicus briefs. The First Liberty Institute and the Brownstown Area Ministerial Association submitted amicus briefs in support of the County. The Freedom From Religion Foundation submitted an amicus brief in support of Woodring. We thank each of the amici for their helpful contributions.

## II. Discussion

The County asks us to reverse the district court's ruling on standing, or alternatively, on the merits. We review the district court's rulings on the parties' cross motions for summary judgment de novo, viewing the facts and drawing reasonable inferences in favor of "the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017).

### A. Standing

Standing requires (1) an injury in fact that is (2) caused by the defendant's conduct and (3) redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The County focuses on the first and third elements. Woodring, as the party invoking federal jurisdiction, has the burden of establishing each element. *Id.* at 561.

#### 1. Injury in Fact

The County contends that Woodring's mere ideological offense at viewing the nativity scene does not qualify as a constitutional injury. Woodring rejoins that she has suffered an injury in fact for two independent reasons. First, as a county taxpayer, Woodring says she has standing to challenge the County's use of tax money to fund the display's electricity. Alternatively, Woodring says her "direct and unwelcome contact" with the nativity scene confers standing.

We easily reject Woodring's first argument. Municipal tax-payer standing requires the plaintiff to show, among other things, "that the municipality has spent tax revenues on the allegedly illegal action." *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 734 (7th Cir. 2020). Here, the evidence shows merely that Woodring pays taxes to the County and that the County pays for the electricity that lights up the display. There is no evidence that the County uses *tax money* to power the display, as opposed to some other source of revenue such as licensing fees, contracts, or donations. "It is not enough to simply allege that the [County] is spending money; the existence of municipal taxpayer standing depends on where the money comes from." *Id.* at 735. As such, Woodring has not shown that she meets the requirements of municipal taxpayer standing.

Woodring's other argument fares better. We have held that a plaintiff who must come into direct and unwelcome contact with a religious display when participating in government or fulfilling legal obligations suffers an injury in fact. In *Doe v. County of Montgomery*, 41 F.3d 1156 (7th Cir. 1994), for example, two county residents had standing to challenge a religious sign displayed over the main entrance to the county courthouse because they had to confront the sign when visiting the courthouse for jury duty, board meetings, voting-related matters, and other government services. *Id.* at 1158–59. For similar reasons, we held in *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000) (*Books I*), that two residents of Elkhart had standing to challenge a Ten Commandments monument displayed on the lawn of a municipal building. *Id.* at 300; *see also Books v. Elkhart Cnty.*, 401 F.3d 857, 858 (7th Cir. 2005) (*Books II*) (holding that one of the same plaintiffs had standing to challenge a Ten Commandments monument inside of a

county administrative building). Importantly, the plaintiffs in *Books I* had standing even though they could have avoided the Ten Commandments by using a different building entrance or simply walking behind the monument. *Id.* at 300–01.

Drawing all reasonable inferences in Woodring's favor, we hold that she has standing under *County of Montgomery* and the *Books* cases. Woodring represents in her affidavit that she is currently meeting with the County Prosecutor to collect child support. She testified at her deposition that she has gone to the prosecutor's office a few times in the past, and she represents in her affidavit that she will continue to go there in the future. Because Woodring is the non-moving party on standing, we accept those facts as true. If the courthouse continues to host the display for six weeks a year, it is reasonable to infer that Woodring will see the nativity scene on one of her trips to the prosecutor's office. Under *Books I*, it makes no difference whether Woodring can or does go out of her way to avoid seeing the display. Nor does it make a difference that the prosecutor's office is in the Judicial Center, rather than the courthouse. Woodring says she passes by and sees the courthouse lawn when she goes to the Judicial Center. Moreover, the County's Christmas display, which sprawls across the courthouse lawn, seems designed for both pedestrians and drivers-by to observe. Because Woodring can see the display from her car, we do not think that her standing to sue turns on whether she is parking at the courthouse or the Judicial Center.

The County's main objection is that Woodring "manufactured" her injury by going to the courthouse for the purpose of seeing the display after living in Jackson County for two years without noticing it. Whatever rhetorical force that argument may have, the County does not explain its legal

significance. We have previously rejected the argument that an avoidable injury cannot constitute injury in fact. *ACLU of Ill. v. City of St. Charles*, 794 F.2d 265, 268 (7th Cir. 1986). In any event, Woodring's standing rests on her trips to the prosecutor's office—not her initial trip to see the display. If the County's argument has any legal relevance, it likely goes to the merits. *See Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (plurality) (concluding that a "passive" Ten Commandments monument did not violate the Establishment Clause and finding it relevant that the plaintiff "apparently walked by the monument for a number of years before bringing this lawsuit").

Amici go further than the County and urge us to ditch "offended observer" standing based on *American Legion*. But only two Justices in *American Legion* addressed standing. *Am. Legion*, 139 S. Ct. at 2098–2103 (Gorsuch, J., concurring in the judgment) (joined by Justice Thomas). The rest of the Justices addressed the merits without mentioning standing—even though, as the Fourth Circuit's opinion below shows, the plaintiffs in *American Legion* were also relying on "offended observer" standing. *Am. Humanist Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 874 F.3d 195, 203 (4th Cir. 2017) (concluding that the plaintiffs had standing because they "regularly encountered the Cross as residents while driving in the area"), *rev'd and remanded sub nom. Am. Legion*, 139 S. Ct. 2067. So *American Legion* does not call into question *County of Montgomery* or the *Books* cases.

### 2. Redressability

The County's next argument is that Woodring's injury is not redressable. It points to her testimony at her deposition that she will not be satisfied unless the County removes the

entire display from the courthouse grounds. According to the County, it could comply with the district court's injunction by adding enough secular items to render the nativity scene constitutional. As such, the County submits that the possibility that Woodring will obtain relief from the injunction is too speculative to justify standing.

The County fails to distinguish Woodring's constitutional injury from her other complaints about the display. The only injury that Woodring sues for is the constitutional harm of an Establishment Clause violation. If that injury is redressable, then Woodring has standing, without regard to other grievances for which she does not seek relief. *See Harp Advert. Ill., Inc. v. Vill. of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993). Woodring's complaint is that the nativity scene violates the Establishment Clause. An injunction that prevents the County from displaying the nativity scene in an unconstitutional manner remedies that injury, even if Woodring would prefer a broader injunction.

The County's reliance on *ACLU of Florida, Inc. v. Dixie County*, 690 F.3d 1244 (11th Cir. 2012), is misplaced. There, the plaintiff alleged that a Ten Commandments monument inside a county building deterred him from purchasing land in the county. *Id.* at 1246. But the plaintiff's affidavit and deposition testimony conflicted as to whether it was the monument alone, or other factors, that caused his injury. *Id.* at 1248–49. The Eleventh Circuit remanded for resolution of that factual issue. *Id.* at 1250. In doing so, it commented, "if other factors caused Doe's injury, that would undermine the claim that his injury is redressable by removal of the monument." *Id. Dixie County* is distinguishable because the plaintiff's injury there was deterrence from purchasing land in the county—not

offense at the monument. If there were other factors prevent-ing the plaintiff from purchasing land, then an injunction against the monument would not redress his injury because he would remain deterred from purchasing land. Here, by contrast, Woodring will be better off if she receives her re-quested injunction because her constitutional injury will be remedied. For these reasons, we find that Woodring's injury is redressable and that she has standing to pursue her claim.

**B. Establishment Clause**

On the merits, the district court held that the County's na-tivity scene violates the Establishment Clause because it con-veys a message of government endorsement of religion and has a religious purpose. The court relied on *Freedom From Re-ligion Foundation, Inc. v. Concord Community Schools*, 885 F.3d 1038 (7th Cir. 2018), where we applied the "endorsement" and "purpose" tests to analyze the constitutionality of a nativity scene in a school concert. *Id.* at 1045. The County argues that the district court should have followed the Supreme Court's more recent decision in *American Legion*. We agree. We begin with a brief review of Establishment Clause doctrine and past nativity scene cases. We then explain why *American Legion* controls our analysis of the County's nativity scene.

### 1.  Establishment Clause Tests

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. It applies to states and municipalities through the Fourteenth Amendment. *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947). The basic policy behind the Establishment Clause "is the principle that the 'First Amend-ment mandates governmental neutrality between religion

and religion, and between religion and nonreligion.'" *McCreary Cnty., Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968)).

The Supreme Court has developed several tests to help apply the general command of the Establishment Clause. The first test comes from *Lemon*, where the Supreme Court held that to pass muster under the Establishment Clause a governmental practice (1) must have a secular purpose; (2) must have "a principal or primary effect" that "neither advances nor inhibits religion;" and (3) must not foster excessive government entanglement with religion. *Lemon*, 403 U.S. at 613.

The "endorsement" test is an offshoot of the *Lemon* test—more specifically, the "effects" prong. This test originated in Justice O'Connor's concurrence in *Lynch v. Donnelly*, 465 U.S. 668 (1984). A majority of the Court adopted it a few years later in *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 592–94 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014). "This analytic tool looks for state action that communicates a government's endorsement of a religion or a particular religious belief." *Concord Cmty. Sch.*, 885 F.3d at 1046. It rests on the notion that the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Cnty. of Allegheny*, 492 U.S. at 594 (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)). "To determine whether a practice endorses religion, we must look at the totality of the circumstances

surrounding the challenged conduct from the perspective of a reasonable observer." *Concord Cmty. Sch.*, 885 F.3d at 1046.

A third test is known as the "coercion" test. The Supreme Court has applied this test in school prayer cases. *See, e.g., Lee v. Weisman*, 505 U.S. 577 (1992); *see also Concord Cmty. Sch.*, 885 F.3d at 1048. As the district court recognized, the coercion test is a poor fit for passive religious displays. Neither party relies on it, so we do not discuss it further.

Finally, the Supreme Court has sometimes applied a "historical" approach, which asks whether a specific governmental practice fits within a long national tradition. *See, e.g., Town of Greece*, 572 U.S. at 577 (inquiring "whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures"). Under this approach, "it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted." *Id.* (citing *Marsh v. Chambers*, 463 U.S. 783 (1983)). The Supreme Court has used this approach to uphold religious prayers that begin legislative sessions and town board meetings. *Marsh*, 463 U.S. at 791; *Town of Greece*, 572 U.S. at 591. A plurality of the Court used a similar historical approach to uphold a passive Ten Commandments display on the grounds of the Texas State Capitol. *Van Orden*, 545 U.S. at 690 (plurality) (emphasizing the "undeniable historical meaning" of the Ten Commandments).

Clearly, no single test governs all Establishment Clause challenges. The Supreme Court has candidly acknowledged that its Establishment Clause cases are "Januslike." *Id.* at 683

(plurality). The *Lemon* test has proven particularly unpopular, and the Supreme Court often finds it unhelpful. *Am. Legion*, 139 S. Ct. at 2080–81. Still, the Court has never formally overruled *Lemon*. *See Concord Cmty. Sch.*, 885 F.3d at 1045 & n.1; *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1521 n.6 (2020) (Thomas, J., dissenting). If the Supreme Court's Establishment Clause cases have any enduring theme, perhaps it is that the appropriate test depends on the type of government action that is challenged. As such, it is worth reviewing cases from the Supreme Court and our court that have considered the constitutionality of nativity scenes in Christmas displays.

### 2. Nativity Scene Cases

The Supreme Court's first encounter with a nativity scene was in *Lynch*, where the Court upheld the City of Pawtucket's Christmas display in a private park. *Lynch*, 465 U.S. at 687. In addition to the nativity scene, the display included "many of the figures and decorations traditionally associated with Christmas," such as a Santa Claus house; reindeer pulling Santa's sleigh; candy-striped poles; a Christmas tree; carolers; cutouts of a clown, elephant, and teddy bear; hundreds of colored lights; and a large "Seasons Greetings" banner. *Id.* at 671. Considering the nativity scene "in the context of the Christmas season," the Court held that it was constitutional because it had a secular purpose—celebrating Christmas—even though it was also a religious symbol. *Id.* at 680–81. The Court's analysis focused largely on history and purpose:

> In a pluralistic society a variety of motives and purposes are implicated. The City, like the Congresses and Presidents, however, has principally taken note of a significant historical

> religious event long celebrated in the Western
> World. The crèche in the display depicts the his-
> torical origins of this traditional event long rec-
> ognized as a National Holiday.
>
> The narrow question is whether there is a secu-
> lar purpose for Pawtucket's display of the
> crèche. The display is sponsored by the City to
> celebrate the Holiday and to depict the origins
> of that Holiday. These are legitimate secular
> purposes. The District Court's inference, drawn
> from the religious nature of the crèche, that the
> City has no secular purpose was, on this record,
> clearly erroneous.

*Id.* (citations and footnotes omitted).

The only other Supreme Court case to address the consti-
tutionality of a nativity scene was *County of Allegheny*. There,
a nativity scene stood alone on the Grand Staircase of the
county courthouse. *County of Allegheny*, 492 U.S. at 578. Ap-
plying the endorsement test from Justice O'Connor's concur-
rence in *Lynch*, the Court held that the nativity scene violated
the Establishment clause. *Id.* at 601–02. *Lynch* was distinguish-
able because "[h]ere, unlike in *Lynch*, nothing in the context
of the display detracts from the crèche's religious message."
*Id.* at 598. That was because, unlike in *Lynch*, the nativity scene
stood alone. *Id.* Not only that, but it sat on the Grand Staircase,
"the 'main' and 'most beautiful' part of the building that is the
seat of county government." *Id.* at 599. "No viewer could rea-
sonably think that it occupies this location without the sup-
port and approval of the government. Thus, by permitting the
'display of the crèche in this particular physical setting,' the

county sends an unmistakable message that it supports and promotes the Christian praise to God that is the crèche's religious message." *Id.* at 599–600 (quoting *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring)).

We too have twice considered the constitutionality of nativity scenes in Christmas displays. Both of our cases came down in the years between *Lynch* and *County of Allegheny*. The first was *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir. 1987). There, we held that a nativity scene in City Hall violated the Establishment Clause. *Id.* at 128. We deemed *Lynch* distinguishable for two reasons. First, the nativity scene was "self-contained," and other "secularized decorations in the vicinity of the nativity scene were not clearly part of the same display." *Id.* at 125–26. Second, the display sat in City Hall, "where the presence of government is pervasive and inescapable." *Id.* at 126. Applying *Lemon*, we found that the nativity scene had secular purposes, including celebrating the public holiday of Christmas, *id.* at 127, but on the effects prong, we held that the display of this "unequivocal Christian symbol" in City Hall communicated a message of government endorsement of religion: "Because City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval." *Id.* at 128. As a result, the nativity scene "inevitably create[d] a clear and strong impression that the local government tacitly endorses Christianity." *Id.*

We decided *Mather v. Village of Mundelein*, 864 F.2d 1291 (7th Cir. 1989) (per curiam) while the Supreme Court was considering *County of Allegheny*. In that case, the Village of Mundelein set up a Christmas display on the front lawn of its city hall. *Id.* at 1292. The display included a nativity scene, a

Christmas tree, and "many other symbols of the season—a Santa Claus and sleigh, carolers, snowmen, carriage lights, wreaths, and two soldiers in the shape of nutcrackers." *Id.* We upheld the display, finding it more analogous to *Lynch* than *American Jewish Congress*. *Id.* at 1292–93. As in *Lynch*, the nativity scene was placed "in the context of other seasonal symbols." *Id.* at 1292. As in *Lynch*, the display was outdoors. *Id.* at 1293. These features put the Village of Mundelein's display "on the *Lynch* side of the line." *Id.*

We have not again considered the constitutionality of a nativity scene in a passive Christmas display, but we did recently consider a challenge to a nativity scene in a different holiday context. In *Concord Community Schools*, students and parents challenged a live nativity scene that occupied two minutes of a school's 90-minute winter concert. 885 F.3d at 1043–44. Applying the endorsement and purpose tests, we upheld the nativity scene. *Id.* at 1045. Starting with endorsement, we observed that "the nativity story is a core part of Christianity, and it would be silly to pretend otherwise. Many nativity scenes therefore run a serious risk of giving a reasonable viewer the impression of religious endorsement." *Id.* at 1046. Nevertheless, the brief inclusion of the nativity scene did not convey a message of endorsement because it was a small component of a larger secular show that included religious imagery from multiple holidays. *Id.* at 1046–48. Given "the broader secular context …, a reasonable audience member, sitting through the 90-minute Spectacular, would not understand the production to be ratifying a religious message." *Id.* at 1047. As for purpose, we found that the school had two sincere secular purposes: "to entertain the audience and to provide pedagogical opportunities for Concord's

performing-arts students." *Id.* at 1050. As such, the scene was constitutional.

The message of these cases is that the constitutionality of a nativity scene depends on its context—both its holiday context and its unique physical context. Although *Lynch* relied on historical tradition to find a secular purpose, later cases focused more on whether a reasonable observer would perceive government endorsement of religion. We next consider the County's contention that *American Legion* requires us to depart from the analytical framework of these prior cases.

**3.   *American Legion***

*American Legion* involved a constitutional challenge to the Bladensburg Peace Cross, a 32-foot Latin cross erected on government property in 1925 "as a tribute to 49 area soldiers who gave their lives in the First World War." *Am. Legion*, 139 S. Ct. at 2074. Seven members of the Supreme Court concluded that the cross did not violate the Establishment Clause, but their reasoning was fractured into several different opinions. Justice Kagan joined parts, but not all, of Justice Alito's main opinion for the Court. Justices Gorsuch and Thomas, though they joined none of it, expressed their agreement with parts of it. Justices Ginsburg and Sotomayor dissented.

The Court's analysis began as a plurality. Writing for four members of the Court (including the Chief Justice, Justice Kavanaugh, and Justice Breyer), Justice Alito discussed "the *Lemon* test's shortcomings," which had rendered it unhelpful in many cases. *Id.* at 2080. In a critical passage, he then wrote:

> For at least four reasons, the *Lemon* test presents particularly daunting problems in cases, including the one now before us, that involve the use,

> for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations. Together, these considerations counsel against efforts to evaluate such cases under *Lemon* and toward application of a presumption of constitutionality for longstanding monuments, symbols, and practices.

*Id.* at 2081–82 (footnote omitted). After the first sentence, Justice Alito dropped a footnote in which he divided the Court's Establishment Clause precedents into six categories. *Id.* at 2081 n.16. The first category was "religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies." *Id.* He cited two examples of cases falling into this category. The first example was *Lynch*. *Id.* After describing the other five categories, he concluded, "We deal here with an issue that falls into the first category." *Id.*

In the next section of the opinion—which Justice Kagan joined, to form a majority—Justice Alito walked through the "four reasons" referenced above. *Id.* at 2082. First, "these cases often concern monuments, symbols, or practices that were first established long ago, and in such cases, identifying their original purpose or purposes may be especially difficult." *Id.* Second, "as time goes by, the purposes associated with an established monument, symbol, or practice often multiply." *Id.* at 2082–83. Third, "just as the purpose for maintaining a monument, symbol, or practice may evolve, the message conveyed may change over time." *Id.* at 2084 (internal quotation marks, citation, and alteration omitted). Fourth, "when time's passage imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral, especially

to the local community for which it has taken on particular meaning." *Id.* Justice Alito then concluded: "These four considerations show that retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones. The passage of time gives rise to a strong presumption of constitutionality." *Id.* at 2085. He used the unique characteristics of the Bladensburg Cross to illustrate the four considerations. *Id.* at 2085–87.

In the next section of the opinion, Justice Alito again wrote for a four-Justice plurality. He began by writing: "While the *Lemon* Court ambitiously attempted to find a grand unified theory of the Establishment Clause, in later cases, we have taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance." *Id.* at 2087. He offered *Marsh* and *Town of Greece* as examples of this more modest historical approach. *Id.* at 2087–89.

Applying the principles articulated in previous sections, Justice Alito—again writing for a majority—concluded that the Bladensburg Cross did not violate the Establishment Clause. *Id.* at 2089. Although the cross was a religious symbol, it had gained an "added secular meaning when used in World War I memorials." *Id.* On top of that, the Cross had "acquired historical importance" as a unique war memorial. *Id.* Indeed, it had "become part of the community." *Id.* There was no evidence, moreover, that the cross had "deliberately disrespected" members of minority faiths. *Id.* at 2089.

There were several other opinions in the case, but we find Justice Thomas's and Justice Gorsuch's separate opinions most relevant for our purposes. Both Justices concurred in the judgment only. Justices Thomas wrote, among other things, that "the plurality rightly rejects [*Lemon*'s] relevance to claims,

like this one, involving religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies. I agree with that aspect of its opinion. I would take the logical next step and overrule the *Lemon* test in all contexts." *Id.* at 2097 (Thomas, J., concurring in the judgment) (citation omitted).

Justice Gorsuch, joined by Justice Thomas, agreed that "*Lemon* was a misadventure." *Id.* at 2101. He also agreed with the plurality's reliance on "a more modest, historically sensitive approach" in place of *Lemon*, and had no "doubt that the monument before us is constitutional in light of the nation's traditions." *Id.* at 2101–02 (Gorsuch, J., concurring in the judgment). But he questioned the plurality's presumption of constitutionality, asking, "How old must a monument, symbol, or practice be to qualify for this new presumption?" *Id.* at 2102. "And where exactly in the Constitution does this presumption come from?" *Id.* He then argued that, despite all the talk of a presumption, the plurality had simply analyzed the cross under the historical framework from *Marsh* and *Town of Greece*. *Id.* Based on that, he offered advice for lower courts: "Though the plurality does not say so in as many words, the message for our lower court colleagues seems unmistakable: Whether a monument, symbol, or practice is old or new, apply *Town of Greece*, not *Lemon*." *Id.*

### 4. Constitutionality of the County's Nativity Scene

This brings us to the constitutionality of the County's nativity scene. Initially, the parties disagree about how we should analyze it after *American Legion*. The County argues that *American Legion* displaces *Lemon* (and the endorsement test) in this context. Woodring, by contrast, believes that the endorsement and purpose tests remain the appropriate

framework for assessing the constitutionality of a nativity scene in a passive Christmas display. She maintains that *American Legion* did not formally overrule any cases, so this Court remains bound by prior precedent on nativity scenes. The district court did not apply *American Legion* because it did not consider the County's nativity scene "longstanding."

Although some aspects of *American Legion* are unclear, one unmistakable message from the opinion is that *Lemon* is no longer a viable framework for cases "that involve the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Am. Legion*, 139 S. Ct. at 2081. As footnote 16 makes clear by citing *Lynch*, this category of cases includes those involving passive holiday displays with nativity scenes. *Id.* at 2081 n.16. To be sure, the section of *American Legion* that disavowed *Lemon* in this context was a plurality opinion. But, as described above, both Justices Thomas and Gorsuch clearly expressed their agreement with that aspect of the opinion. *Id.* at 2097 (Thomas, J., concurring in the judgment); *id.* at 2101–02 (Gorsuch, J., concurring in the judgment). Thus, six Justices found that *Lemon* is not the appropriate test for analyzing passive holiday displays that include nativity scenes. Although this was not a formal holding of the Court, to apply *Lemon* in this context after *American Legion* would be to ignore a clear directive from a majority of the Supreme Court.

The same goes for the endorsement test. In the words of *American Legion*, the endorsement test is an "elaborat[ion]" on *Lemon*'s effects prong. *Am. Legion*, 139 S. Ct. at 2080; *see also id.* at 2081 n.15 (referring to "*Lemon* and the endorsement gloss"); *Lynch*, 465 U.S. at 689 (O'Connor, J., concurring) (proposing the endorsement test as a way to "clarif[y] the *Lemon* test as

an analytical device"). We too "have viewed the endorsement test as … part of *Lemon*'s second prong." *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 850 (7th Cir. 2012) (en banc); *accord Books I*, 235 F.3d at 304. Because the endorsement test is simply a gloss on *Lemon*, the Supreme Court's repudiation of *Lemon* in this context applies equally to the endorsement test. After all, the Fourth Circuit's opinion below in *American Legion* applied the endorsement test to hold the Bladensburg Cross unconstitutional, *Am. Humanist Ass'n*, 874 F.3d at 200, and the Supreme Court reversed without analyzing endorsement, *Am. Legion*, 139 S. Ct. at 2090. We do not believe that the Supreme Court meant to silently preserve the endorsement test in this context while rejecting the synonymous *Lemon* test.

Woodring and amicus Freedom From Religion Foundation tell us that we may not disregard binding precedent until it is overturned. But that is not entirely true. We follow our prior opinions "unless and until they have been overruled *or undermined* by the decisions of a higher court." *Wilson v. Cook Cnty.*, 937 F.3d 1028, 1035 (7th Cir. 2019) (per curiam) (emphasis added) (internal quotation marks and citation omitted). Our prior decisions on passive holiday displays that feature nativity scenes have been "undermined" by *American Legion*. Amicus Freedom From Religion Foundation also points out that the Supreme Court does not overrule itself by implication. *Censke v. United States*, 947 F.3d 488, 492 (7th Cir. 2020) ("[T]he Court has explained that it does not overrule itself silently."). But there is nothing silent about *American Legion*'s repudiation of *Lemon*. Six Justices were quite explicit that it does not apply in this context.

All three circuits that have interpreted *American Legion* in the context of religiously expressive monuments, symbols,

and practices have similarly concluded that, after *American Legion*, "*Lemon* does not apply to 'religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies.'" *Freedom From Religion Found., Inc. v. Cnty. of Lehigh*, 933 F.3d 275, 281 (3d Cir. 2019) (quoting *Am. Legion*, 139 S. Ct. at 2081 n.16); *accord Perrier-Bilbo v. United States*, 954 F.3d 413, 424 (1st Cir. 2020) (holding that *American Legion* "explicitly rejected" *Lemon* in this context); *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1326 (11th Cir. 2020) ("*Lemon* is dead … with respect to cases involving religious displays and monuments—including crosses. We count six clear votes for that proposition.").

For these reasons, we conclude that the endorsement and purpose tests are no longer the appropriate framework for assessing the constitutionality of nativity scenes in passive holiday displays on government property.[*] We need not, and do not, decide how, if at all, *American Legion* affects any of our other prior Establishment Clause decisions, including *Concord Community Schools*. That decision arose in a notably different context, so its continuing validity is not before us.

The dissent takes issue with our overruling of *American Jewish Congress* and *Village of Mundelein* because, in its view, those cases were correctly decided. The dissent misunderstands our reasoning. We decline to follow those cases

---

[*] Because we decline to follow our circuit precedent on similar nativity scenes, i.e., *American Jewish Congress* and *Village of Mundelein*, we circulated this opinion under Circuit Rule 40(e) to all judges in active service. A majority of judges did not wish to rehear the case en banc. Judges Rovner and Hamilton voted to grant rehearing en banc.

because they no longer supply the controlling legal principles; we express no view on whether they came out the right way.

The next question we confront is how *American Legion* applies. Other circuits have read *American Legion* to require "'a strong presumption of constitutionality' for 'established, religiously expressive monuments, symbols, and practices.'" *Cnty. of Lehigh*, 933 F.3d at 281 (quoting *Am. Legion*, 139 S. Ct. at 2085); *accord Perrier-Bilbo*, 954 F.3d at 425; *Kondrat'yev*, 949 F.3d at 1329. And the only way to overcome this presumption is "to demonstrate discriminatory intent in the decision to maintain a design or disrespect based on religion in the challenged design itself." *Cnty. of Lehigh*, 933 F.3d at 281; *accord Perrier-Bilbo*, 954 F.3d at 425; *see Kondrat'yev*, 949 F.3d at 1333. These circuits generally treat *American Legion*'s "four considerations" as explanations for its presumption, rather than a test that determines whether the presumption applies. *Perrier-Bilbo*, 954 F.3d at 426 n.10; *Cnty. of Lehigh*, 933 F.3d at 285; *see Kondrat'yev*, 949 F.3d at 1330. Applying the presumption of constitutionality, each of these circuits upheld a longstanding religious monument, symbol, or practice. *Perrier-Bilbo*, 954 F.3d at 428 (naturalization oath with the words "so help me God"); *Kondrat'yev*, 949 F.3d at 1334 (34-foot Latin cross on public land); *Cnty. of Lehigh*, 933 F.3d at 282 (county seal that included a Latin cross).

We are differently positioned than these other circuits because we are unable to conclude, as a threshold matter, that the County's nativity scene is "longstanding" or "established," such that *American Legion*'s presumption could attach. The nativity scene dates to 2003. Woodring filed suit in 2018, when the display was 15 years old. Maybe that is "longstanding," or "established." Maybe it is not. We simply

do not know. The County and amici tell us that the display must be longstanding because *American Legion* referenced the statue of the Pueblo religious leader Po'Pay, which has been part of the National Statuary Hall Collection in the United States Capitol since only 2005. *See Am. Legion*, 139 S. Ct. at 2086. But the Supreme Court did not call this statue "longstanding" or "established," or even imply that it was. It used the statue, which has symbols of the Pueblo religion, as one of several examples of "monuments honoring important figures in our Nation's history" that "include a symbolic reference to faith in the design of the memorial." *Id.* The Court did not mention the date of the statue. *Id.* We think a better point of reference is the Bladensburg Cross itself, which was nearly a century old. *Id.* at 2074. Similarly, *Perrier-Bilbo* involved a 90-year-old oath. 954 F.3d at 427–28. *Kondrat'yev* involved a cross that was at least 50 years old. 949 F.3d at 1331. And *County of Lehigh* involved a 75-year-old seal. 933 F.3d at 278. Compared to these other monuments, symbols, and practices, the County's nativity scene is rather young. Without more guidance on the meaning of "longstanding" or "established," we cannot conclude in a principled way that the County's nativity scene deserves these labels. *See Am. Legion*, 139 S. Ct. at 2102 (Gorsuch, J., concurring in the judgment) (noting the difficulty of determining whether a monument, symbol, or practice is "longstanding").

According to amicus First Liberty Institute, the pertinent question is whether Christmas displays involving nativity scenes, as a general phenomenon, are longstanding. We acknowledge that *American Legion* is arguably ambiguous as to whether a specific monument, symbol, or practice must be longstanding, or whether it must simply fit into a longstanding tradition. We conclude, however, that for purposes of the

presumption of constitutionality, the specific monument, symbol, or practice at issue must be "longstanding" or "established." We reach this conclusion because Justices Breyer and Kagan—two essential votes for the presumption of constitutionality—expressly rejected First Liberty's interpretation of Justice Alito's main opinion. Justice Breyer wrote in his concurrence, which Justice Kagan joined, that the case "would be different … if the Cross had been erected only recently, rather than in the aftermath of World War I." *Am. Legion*, 139 S. Ct. at 2091 (Breyer, J., concurring). He continued: "A newer memorial, erected under different circumstances, would not necessarily be permissible under this approach." *Id.* So, two of the five Justices who signed on to the presumption of constitutionality did not read Justice Alito's opinion as establishing a presumption of constitutionality for every monument, symbol, or practice that fits within a historical tradition. This leads us to conclude that the presumption of constitutionality does not apply to the nativity scene in the County's fifteen-year-old Christmas display, even if the display fits within a longstanding historical tradition.

This is not to say, however, that *Lemon* applies. As described above, at least six Justices rejected *Lemon* in cases "that involve the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Am. Legion*, 139 S. Ct. at 2081. *Lemon* is a durable creature, *see Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment), but we do not think that it springs back into life just because the presumption of constitutionality does not apply. Rather, a majority of the Justices—Justices Alito, Roberts, Kavanaugh, Gorsuch, and Thomas—also endorsed the "more modest" historical approach from *Marsh* and *Town of Greece*. *Am.*

*Legion*, 139 S. Ct. at 2087 (plurality); *id.* at 2101–02 (Gorsuch, J. concurring in the judgment) (joined by Justice Thomas). (We do not count Justice Breyer because he expressed some reservations about the historical approach in his concurrence. *Am. Legion*, 139 S. Ct. at 2091 (Breyer, J. concurring)). Therefore, we conclude that, even though the presumption of constitutionality does not apply, *American Legion* requires us to analyze the County's nativity scene under the historical approach from *Marsh* and *Town of Greece*. *See Am. Legion*, 139 S. Ct. at 2102 (Gorsuch, J., concurring in the judgment).

The historical approach "focuses on the particular issue at hand and looks to history for guidance." *Am. Legion*, 139 S. Ct. at 2087 (plurality). It asks whether a longstanding tradition supports a challenged governmental practice and whether the practice "fits within the tradition." *Town of Greece*, 572 U.S. at 577. More so than the presumption of constitutionality, the historical approach focuses on "categories of monuments, symbols, and practices with a longstanding history." *Am. Legion*, 139 S. Ct. at 2089 (plurality); *see also id.* at 2102 (Gorsuch, J., concurring in the judgment) ("[W]hat matters when it comes to assessing a monument, symbol, or practice isn't its age but its compliance with ageless principles."). The Supreme Court has signaled that a religious monument, symbol, or practice with historical footing might still be unconstitutional if it deviates from the historical tradition by exhibiting intolerance for differing views or discriminatory intent. *See Am. Legion*, 139 S. Ct. at 2089; *id.* at 2091 (Breyer, J., concurring); *see also Town of Greece*, 572 U.S. at 577–91; *Marsh*, 463 U.S. at 790 ("Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees.").

Applying a historical approach to analyze the constitutionality of the County's nativity scene is straightforward because the Supreme Court laid the historical groundwork in *Lynch*. Writing nearly 40 years ago, the Court began its opinion by describing the City of Pawtucket's nativity scene as "essentially like those to be found in hundreds of towns or cities across the Nation—often on public grounds—during the Christmas season." *Lynch*, 465 U.S. at 671. The Court opened its legal analysis by describing the historical dimensions of the Establishment Clause: "The Court's interpretation of the Establishment Clause has comported with what history reveals was the contemporaneous understanding of its guarantees." *Id.* at 673.

After summarizing *Marsh*, the Court segued to religious holidays by saying: "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.* at 674. For example, Congress and the President had long ago "proclaimed both Christmas and Thanksgiving National Holidays in religious terms" and "by Acts of Congress, it has long been the practice that federal employees are released from duties on these National Holidays." *Id.* at 676. Therefore, it was "clear that Government has long recognized—indeed it has subsidized—holidays with religious significance." *Id.* The Court described some of the "countless other illustrations of the Government's acknowledgment of our religious heritage," including Presidential Proclamations and messages to commemorate Jewish Heritage Week and the Jewish High Holy Days. *Id.* at 677. "One cannot look at even this brief resume without finding that our history is pervaded by expressions of religious beliefs." *Id.* "Equally pervasive is the

evidence of accommodation of all faiths and all forms of religious expression, and hostility toward none." *Id.*

Turning to the City of Pawtucket's Christmas display, the Court wrote, "[i]n a pluralistic society a variety of motives and purposes are implicated." *Id.* at 680. The City of Pawtucket, "like the Congresses and Presidents, however, has principally taken note of a significant historical religious event long celebrated in the Western World. The crèche in the display depicts the historical origins of this traditional event long recognized as a National Holiday." *Id.* Because the City had sponsored the display "to celebrate the Holiday and to depict the origins of that Holiday," it was constitutional. *Id.* at 681.

The historical analysis from *Lynch* convinces us that the nativity scene here is constitutional, insofar as it fits within a long national tradition of using the nativity scene in broader holiday displays to "depict[] the historical origins" of Christmas—a "traditional event long recognized as a National Holiday." *Lynch*, 465 U.S. at 680. Like the nativity scene in *Lynch*, the County's nativity scene is part of a larger Christmas display that contains various other symbols of Christmas, including Santa Claus in his sleigh, a reindeer, four carolers standing in front of a lamp post, and seven prominent candy-striped poles. Like the nativity scene in *Lynch*, the County's nativity scene fits into the County's celebration of Christmas by depicting the origins of the public holiday. As *Lynch* recognized, the government's celebration of Christmas comports with a broader pattern of government recognition of public holidays, Christian and non-Christian alike. *Lynch*, 465 U.S. at 677. "Where categories of monuments, symbols, and practices with a longstanding history follow in that tradition, they are

likewise constitutional." *Am. Legion*, 139 S. Ct. at 2089 (plurality).

Woodring supplies no good reason why the County's nativity scene does not fit within the historical tradition outlined in *Lynch*. As discussed, a governmental practice with historical support may still be unconstitutional if it is intolerant or discriminatory toward differing views. *See Am. Legion*, 139 S. Ct. at 2089. We see no evidence of that here. Woodring and amicus Freedom From Religion Foundation highlight a 2001 statement from the then-President of the County Commissioner's in which he public apologized for not setting up "a nativity scene" (as opposed to a "Christmas display") in 2001. But we do not see how this remote comment, of ambiguous significance, shows intolerance or discriminatory intent. *See Am. Legion*, 139 S. Ct. at 2089. Nor do we find it significant that the Freedom From Religion Foundation's demand letter apparently prompted a rally at the courthouse, where some people prayed. At most, the rally and prayer show that some people in the community valued the nativity scene and felt it had religious significance. That does not call into question the County's motive for hosting the display on courthouse grounds.

The dissent sees our reliance on *Lynch* as a disguised application of the endorsement test. We disagree. For one thing, *Lynch* did not apply the endorsement test. A majority of the Court upheld the City of Pawtucket's nativity scene without regard to the "endorsement" framework that Justice O'Connor pioneered in her concurrence. The majority's reasoning in *Lynch* was essentially a blend of *Lemon*'s purpose prong and the historical inquiry from *Marsh* (which, incidentally, a nearly identical majority of the Court had decided one year

earlier). More to the point, we rely on *Lynch* for its historical discussion, rather than its broader doctrinal teachings. We apply the doctrine of *Marsh* and *Town of Greece*, as *American Legion* instructs. *Lynch* helpfully canvasses the historical tradition behind nativity scenes in Christmas displays, so it plays a role in our historical analysis. We believe that lower courts should look to *American Legion*, and not *Lynch*, for the governing legal principles.

## III. Conclusion

We hold today that *American Legion* displaces the purpose and endorsement tests in the context of Establishment Clause challenges to nativity scenes in passive Christmas displays on government property. Applying *American Legion*, we hold that Jackson County's nativity scene as displayed in 2019 does not violate the Establishment Clause. We make no predictions as to how *American Legion* might affect other types of Establishment Clause cases. For these reasons, we AFFIRM the district court's ruling that Woodring has standing, REVERSE its ruling that the County's nativity scene violates the Establishment clause, VACATE the injunction, and REMAND with instructions for the district court to enter summary judgment in favor of Jackson County.

HAMILTON, *Circuit Judge*, dissenting. The district court properly enjoined Jackson County's courthouse-lawn display of a Nativity scene that sent a clear message of government endorsement of Christianity. In reversing, the majority departs from controlling Supreme Court precedent that the Supreme Court itself has left intact. It also overrules directly applicable Seventh Circuit precedent without sufficient reason. I respectfully dissent.

The core principle that the government has no business endorsing particular religions or religion in general remains healthy. "The touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County v. American Civil Liberties Union*, 545 U.S. 844, 860 (2005), quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); accord, e.g., *Larson v. Valente*, 456 U.S. 228, 244 (1982) (Establishment Clause clearly commands that "one religious denomination cannot be officially preferred over another"). That core principle should be enough for us to affirm in this case, where the county's display is dominated by the Nativity scene. That would be consistent with the Nativity scene decisions in both *Lynch v. Donnelly*, 465 U.S. 668 (1984), and *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989). As explained below, the Supreme Court's more recent decision in *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067 (2019), does not require a different result.

I. *Points of Agreement—Standing and Stand-Alone Nativity Scenes*

Before explaining my disagreement, however, I note three important points of agreement with the majority. First, the

majority holds that plaintiff Woodring has proven her standing under the Establishment Clause. She was an "offended observer" who encountered the disputed holiday display while going about her life and business. That is enough. Ante at 10–11. That holding is consistent with our precedent and with *American Legion*, where the plaintiffs were offended observers of the monumental cross on government land, and the Supreme Court decided the case on the merits over dissenters' objections to standing. See *American Humanist Ass'n v. Maryland-National Capital Park & Planning Comm'n*, 874 F.3d 195, 203 (4th Cir. 2017) (plaintiffs had standing because they regularly encountered Bladensburg Cross while driving in area), rev'd on merits, *American Legion*, 139 S. Ct. 2067 (2019).

In this case, plaintiff established standing without having changed her routes or habits to avoid the holiday display. A religious majority is not entitled to use the government's power to force others to alter their activities or to go out of their way to avoid government endorsements of particular religious faiths.

Second, I agree with the majority that the county's Nativity display is not entitled to a "presumption" of constitutionality under *American Legion*. Ante at 28–29. The display does not have historical roots comparable to the Bladensburg Cross in *American Legion*. Also, the county display could easily be modified to comply with the Establishment Clause without signaling hostility to religion, which concerned the *American Legion* majority as it contemplated an order to remove a three-story-tall stone cross that had stood for nearly a century. See 139 S. Ct. at 2084–85.

Third, note that after an extended tour of Establishment Clause doctrine and the ambiguous signals from *American Legion*, the majority opinion returns in the end to measure the county Nativity scene against *Lynch v. Donnelly*. Ante at 32. The majority opinion finds the county's modified holiday display permissible because it is "part of a larger Christmas display that contains various other symbols of Christmas…." *Id*. Implicit in that reasoning is the majority's continued recognition that a stand-alone religious display on government property or with other governmental endorsement will continue to violate the Establishment Clause, as in *County of Allegheny* and *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir. 1987). See also *Freedom from Religion Foundation v. Concord Community Schools*, 885 F.3d 1038 (7th Cir. 2018) (applying endorsement test to public school's holiday show).

II. *Religious Holiday Displays and the Temptation of Government Endorsement*

Returning to the merits, the majority's feints toward displacing the endorsement and purpose tests. I say "feints" because the majority ends up applying the *American Legion* "historical" test in a way that actually looks a lot like the endorsement test, properly understood, taking full account of the content, history, and larger context of the display. Neither this case nor *American Legion* should be understood as a revolution in Establishment Clause doctrine.

A. *A Straightforward Path to a Decision*

I disagree with the majority's result because of the specific facts: the religious content dominates the county's Christmas display here. Take a look at the photograph in the majority opinion. Ante at 4. The Nativity scene actually straddles the

main walkway from the street to the courthouse entrance. A person visiting county offices must walk right between the wise men and the holy manger. This takes on extra significance at the county's annual holiday celebration when the community processes in single file along the walkway into the courthouse. Moreover, religious figures and symbols outnumber the secular symbols, which are relegated to the edges of the display. Ante at 3. The Nativity scene remains the central, dominant display.[1]

Viewed in its entirety and in context, the display therefore sends a strong message of government endorsement of Christianity. This display is closer to the stand-alone Nativity scenes held unconstitutional in *County of Allegheny* and *American Jewish Congress* than it is to the predominantly secular holiday displays upheld in *Lynch* and *Mather v. Village of Mundelein*, 864 F.2d 1291 (7th Cir. 1989), despite their inclusion of Nativity scenes.

One way of looking at this case, and of narrowing my disagreement with the majority's result, is in terms of judges' and the public's answers to whether the overall display conveys a message of government endorsement of Christianity, with the guidelines charted by those four cases. The correct answer seems clear to me. I understand, though, that others might see it differently, particularly to the extent that the doctrine calls for a judge, for better or worse, to "announce his gestalt." See

---

[1] Critics of the county's display could quibble further, but do not. "Santa Claus" is short for Saint Nicholas, a Christian saint whose original connections to Christmas are debated by scholars of folklore. Nevertheless, American courts deem Santa Claus and Christmas trees to be secular symbols, regardless of their origins.

*American Jewish Congress*, 827 F.2d at 129 (Easterbrook, J., dissenting); see also *County of Allegheny*, 492 U.S. at 643 (Brennan, J., dissenting in part) (expressing concern that endorsement test might make "analysis under the Establishment Clause look more like an exam in Art 101 than an inquiry into constitutional law").

B. *The Abstract Doctrinal Detour*

The majority opinion does not take that straightforward approach. Instead, it takes a tour through abstract Establishment Clause doctrine and the Supreme Court's recent decision in *American Legion*. After the trip through those multiple opinions, however, the majority actually circles back in the end to decide the case based on *Lynch v. Donnelly*. It finds this Nativity scene permissible because, "Like the nativity scene in *Lynch*, the County's nativity scene is part of a larger Christmas display that contains various other symbols of Christmas …." Ante at 32. Along the way, however, the majority opinion reads too much into *American Legion* and even overrules through Circuit Rule 40(e) our two key precedents on holiday displays, *American Jewish Congress* and *Village of Mundelein*—yet pointedly refrains from saying they were wrongly decided.

C. *Sources of the Difficulties*

Christians have long celebrated Christmas to honor and worship the birth of Jesus Christ. The Christmas holiday and season have spread in commercial and cultural ways far beyond the religious origins of Christmas. Private displays of Nativity scenes, Christmas lights, Santa Claus and his reindeer and elves, and related images (angels, bells, carolers, stars, candy canes, etc.) saturate our culture every December.

For some Christians, it can be difficult to accept the secular appropriation of the religious center of Christmas for a holiday that emphasizes shopping along with generosity. For other Christians, it can be difficult to remember that not everyone shares their faith or appreciates the religious roots of the celebration. And for believers in other faiths, explicit government recognition of the birth of the Christian Messiah may plainly imply an official endorsement of Christian superiority and dominance over their own faiths. What Christians honor and worship as the true story of the birth of the Savior may seem to others just one example—albeit a remarkably successful one—of a common, ancient Middle Eastern form of mythology: the story of a miraculous birth of a religious leader, told to fit earlier prophecies and to cloak the leader's later life with divine blessing.[2]

Religious freedom and dissent were central forces shaping the British colonies in North America that became the United States of America. The religious freedom and diversity at the heart of the American experiment have continued to shape our history, from the Puritans in Plymouth and dissenters in

---

[2] The Jackson County Nativity scene, like virtually all others, blends elements from the very different Bethlehem birth narratives in the Gospel of Luke, with the revelation to and visit by shepherds, and the Gospel of Matthew, with the visiting magi and the slaughter of the innocents (which is left out of most modern tellings). Compare Luke 1:1–2:20 with Matthew 1:1–2:23. The other canonical Gospels, Mark and John, do not include any birth story. The almost as ancient but non-canonical Infancy Gospel of James includes elements of both the Luke and Matthew versions, but puts the birth in a cave near Bethlehem, tries to account for John the Baptist's survival of the slaughter of the innocents, and ties the birth story closely to contemporary Jewish worship practices in the Second Temple of Jerusalem. See Complete Gospels, Annotated Scholars Version 380–96 (1992).

Rhode Island to the Society of Friends and other faiths in Pennsylvania, from the first and second Great Awakenings to Brigham Young and the founding of Utah, and from the Social Gospel of the early twentieth century to the Civil Rights movement and the recent rise of politically conservative evangelical Christianity.

Throughout American history, dominant religious groups (usually Christian but not always) have been tempted to harness the power and resources of federal, state, and local governments to promote their faiths. And since the early to mid-twentieth century, courts have enforced the Establishment Clause by limiting government promotion of religion in myriad ways while leaving room for governments to recognize the deep roots of religion in our history and culture.

In Establishment Clause cases, including the numerous cases dealing with religious elements in official Christmas displays, courts have struggled to maintain the appropriate balances. The Supreme Court has had a difficult time shaping a consistent and coherent body of doctrine in this area. See ante at 15 (cases are "Januslike"), quoting *Van Orden v. Perry*, 545 U.S. 677, 683 (2005) (plurality). Rare is the Supreme Court Establishment Clause case with a unanimous vote, or even with just one majority and one dissent. The cases come in too many varieties and invite so many different approaches. Court majorities produce judgments, but the Court has had a difficult time mustering even bare majorities for holdings as opposed to outcomes.

D. *Focusing on the Facts—Endorsement in Full Context*

As a result, the lower federal courts are best advised to focus less on theory and doctrine and more on facts, which provide our surest guide. The Nativity scene cases provide guidance that should be clear enough. Stand-alone Nativity scenes on government property will be enjoined. They send a message of government endorsement of a particular faith. Nativity scenes that are part of broader holiday displays including substantial secular elements and/or symbols of other religious traditions and seasonal holidays will not be enjoined.

The facts and cases may be arrayed roughly along a spectrum ranging from stand-alone Nativity scenes to those that are small parts of much broader seasonal displays. There is not a sharp line. It's not as simple as counting whether there are more shepherds and angels than elves and snowmen. But the broad principle against government endorsement of particular religions provides a workable standard. If the display is dominated by religious symbolism, with only minor or token secular symbols and symbols of other faiths, the message of endorsement calls for court intervention. That's the path marked by *County of Allegheny* and *Lynch*, and by our decisions in *American Jewish Congress* and *Village of Mundelein*. For other circuits' similar treatments of cases along this spectrum, see, e.g., *ACLU v. City of Florrisant*, 186 F.3d 1095 (8th Cir. 1999); *ACLU v. Schundler*, 168 F.3d 92 (3d Cir. 1999) (Alito, J.); *Elewski v. City of Syracuse*, 123 F.3d 51 (2d Cir. 1997); *Smith v. County of Albemarle*, 895 F.2d 953 (4th Cir. 1990); *ACLU v. City of Birmingham*, 791 F.2d 1561 (6th Cir. 1986).[3]

---

[3] The majority writes that *Lynch* applied not the endorsement test but a blend of *Lemon*'s purpose prong and the historical inquiry from *Marsh v.*

E.  *American Legion*

The majority opinion leaves those cases behind for a bit while it analyzes the Supreme Court's 2019 decision in *American Legion*, which rejected an Establishment Clause challenge to a three-story-tall concrete and stone cross erected on public land in 1925. The cross was erected to honor soldiers who gave their lives in what was then known as The Great War. The portions of Justice Alito's lead opinion that are actually a majority opinion emphasize the passage of time and the role of crosses in monuments from that war, in particular. 139 S. Ct. at 2085–87 & 2089–90.

---

*Chambers*, 463 U.S. 783 (1983). Ante at 33. In saying that *Lynch* is based on endorsement, I am using shorthand to summarize a complicated doctrinal evolution. Chief Justice Burger's majority opinion in *Lynch* applied all three prongs of the *Lemon* test. Plaintiffs' argument was strongest under the "effects" prong of the *Lemon* test, which the majority addressed in terms of whether the public display "advanced" Christianity by, in effect, endorsing it. Justice O'Connor's concurrence offered the first version of the endorsement test, which she saw as consistent with the majority, which she joined. Five years later, in *County of Allegheny*, the Supreme Court looked back at *Lynch* and understood it primarily in terms of endorsement. That assertion also summarizes a complex matrix of opinions. But the five Justices who voted to hold the stand-alone Nativity scene unconstitutional all used or joined language of endorsement to distinguish that result from the result in *Lynch*. See 492 U.S. at 598–600 (Blackmun, J., majority opinion); *id*. at 623–32 (O'Connor, J., concurring in part); *id*. at 637 (Brennan, J., concurring in part). For those reasons, "endorsement" is the best way to understand both cases' different treatments of the two Nativity scenes. To illustrate the challenges of the Court's fragmented opinions in Establishment Clause cases, *County of Allegheny* and *American Legion* serve nicely as Exhibits A and B. For Exhibit C, see *Town of Greece v. Galloway*, 572 U.S. 565, 579–80 (2014), which expressly repudiated dicta in *County of Allegheny* describing *Marsh v. Chambers*, leading Westlaw to "red-flag" *County of Allegheny*. The list of exhibits could go on.

The majority opinion here parses which Justices joined which parts of the lead opinion and adds together concurring opinions to conclude that we should not apply any part of the *Lemon* test here. Ante at 20–26, discussing *American Legion*'s treatment of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). From this process, the majority opinion concludes that the purpose and effects prongs of the *Lemon* test do not apply to passive holiday displays. It also expresses approval of recent opinions in other circuits that have concluded more broadly that, after *American Legion*, "*Lemon* does not apply to 'religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies.'" Ante at 26, quoting *Freedom From Religion Foundation, Inc. v. County of Lehigh*, 933 F.3d 275, 281 (3d Cir. 2019), and citing *Perrier-Bilbo v. United States*, 954 F.3d 413, 424 (1st Cir. 2020); *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1326 (11th Cir. 2020).

The Supreme Court itself did not go nearly that far in *American Legion*. It did not overrule *Lemon*, and it most certainly did not overrule *Lynch* or *County of Allegheny* and their focus on endorsement with government-sponsored holiday displays. We need to recall that only the Supreme Court can overrule its own decisions. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); accord, e.g., *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("it is this Court's prerogative alone to overrule one of its precedents"); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (instructing courts of appeals to leave to the Supreme Court "the prerogative of overruling its own decisions").

More specifically, the majority reads far too much into footnote 16 and its accompanying text in *American Legion*.

That footnote sketched six "rough categories" of Establishment Clause cases and placed *Lynch* within the first category of "religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies." *American Legion*, 139 S. Ct. at 2081 n.16. The footnote and its accompanying text, which are not part of the majority opinion, did not even say that *Lemon* would no longer govern *any* "Category One" case, including *Lynch*. Rather, the footnote clarified that the opinion was not making category-wide changes: "We deal here with *an issue that falls into* the first category." *Id.* (emphasis added). That limited issue was about longstanding monuments like the Bladensburg Cross that displayed four key factors, which "together … counsel[ed] against … *Lemon* and toward a presumption of constitutionality." *Id.* at 2081–82.

The full paragraph accompanying footnote 16 confirms this more limited view:

> For at least four reasons, the *Lemon* test presents particularly daunting problems in cases, including the one now before us, that involve the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations.[16] Together, these considerations counsel against efforts to evaluate such cases under *Lemon* and toward application of a presumption of constitutionality for longstanding monuments, symbols, and practices.

*Id.* In this passage, both the opening reference to the "four reasons" and the ending qualifier about "longstanding" practices clarify that there was a clear majority in *American Legion* only for the narrower proposition that *Lemon* was displaced in the subset of "Category One" cases dealing with longstanding

practices that exhibit all four factors (which the rest of the opinion revolved around). This is the better reading of the key passages that the majority leans on, and it is the reading that avoids overruling broad swaths of Supreme Court precedent by implication.[4]

Surprisingly, though, after the doctrinal tour and abstract overrulings, the majority opinion then proceeds to apply its new historical approach in a way that turns back to . . . *Lynch*! The majority concludes that the Jackson County Nativity scene is constitutional only "insofar as it fits within a long national tradition of using the nativity scene *in broader holiday displays … that contain*[] *various other symbols of Christmas….*" Ante at 32, citing *Lynch*, 465 U.S. at 677, 680 (emphasis added). The majority opinion does not challenge the unconstitutionality of the crèches in *County of Allegheny* or even *American Jewish Congress.*

As a practical matter, therefore, the majority seems to draw the familiar distinction between *Lynch* and *County of Allegheny*, just under a new doctrinal banner. The logic must be that there is a longstanding American tradition of integrated displays but not religiously dominant displays. That conclusion, however, is not proven empirically as a matter of history. It is instead reached by reference back to *Lynch*, which recognized that *in some contexts* Nativity scenes do no more

---

[4] Perhaps the broader demise of *Lemon* is finally imminent, but *Lemon* has survived scholars' predictions of its demise for decades. See, e.g., Jeffrey Rosen, *Lemon Law*, The New Republic (March 29, 1993) (noting that as of 1993, seven of nine Justices had promised to re-examine *Lemon*).

than permissibly depict "the historical origins of [a] traditional event long recognized as a National Holiday." Ante at 32, quoting *Lynch*, 465 U.S. at 680.

The majority opinion's ultimate return to the *Lynch*/*County of Allegheny* distinction is telling. It shows that the Establishment Clause's core concern over religious endorsement still drives which displays end up on which sides of the constitutional line. The majority opinion simply bakes this concern into its view of what our American "tradition" is and is not. The same could be said of *American Legion* itself, where each of the opinion's four considerations focused on the Bladensburg Cross's religiously neutral purposes and effects. See *American Legion*, 139 S. Ct. 2082–85; *id.* at 2094 (Kagan, J., concurring in part) ("this very suit shows" that *Lemon*'s "focus on purposes and effects is crucial").

Frankly, I don't see much meaningful doctrinal difference, yet, between the majority opinion's "historical" treatment of *Lynch* and the endorsement test, which, when properly understood, takes into account the history and context of the practice or monument in question. See, e.g., *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–10 (2000) ("School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'"), quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring); *Concord Community Schools*, 885 F.3d at 1046 ("The reasonable observer is aware of a situation's history and context and encompasses the views of adherents and non-adherents alike."); *Doe v. Elmbrook School Dist.*, 687 F.3d 840, 857–

58 (7th Cir. 2012) (en banc) (Hamilton, J., concurring) ("endorsement test asks whether a reasonable observer, apprised of the circumstances and history of the disputed governmental practice, would conclude that it conveys a message of endorsement or disapproval of religious faith," and test takes into account perspectives of non-adherents).

The majority leaves unanswered how *American Jewish Congress* and *Village of Mundelein* should have been decided. Based on *Lynch* and *County of Allegheny*, the answer should be easy: just as we decided them originally. In *American Jewish Congress*, the Nativity scene stood alone at the Chicago city hall. The clear message of endorsement made that display unconstitutional. That result is consistent with the Supreme Court's later decision in *County of Allegheny*, unaffected by *American Legion*, holding the stand-alone Nativity scene in the city hall unconstitutional under the endorsement test. *Village of Mundelein* should also come out the same way today. The Nativity scene there was seen as a small part of a larger holiday display. It did not so dominate the display as to communicate a message of religious endorsement.[5]

The majority opinion in the end says it "holds" that *American Legion* "displaces the purpose and endorsement tests" in the narrow context of "Establishment Clause challenges to nativity scenes in passive Christmas displays on government property." Ante at 34. The opinion then disclaims broader consequences for its logic: "We make no predictions as to how

---

[5] If I had been voting in 1989, I might have joined Judge Flaum's thoughtful dissent in *Village of Mundelein*. By now, however, the line between the stand-alone Nativity scenes in *County of Allegheny* and *American Jewish Congress*, on one hand, and the much larger seasonal displays in *Lynch* and *Village of Mundelein* on the other, is more firmly settled.

*American Legion* might affect other types of Establishment Clause cases," i.e., other than "passive Christmas displays on government property." *Id*. I welcome that caution. I expect, however, that the majority's doctrinal revisions will be read as inviting many new challenges to Establishment Clause precedents. When they arrive in court, I respectfully suggest, district judges and parties should focus primarily on two points: the facts of precedents, and the majority opinion's return to the reasoning of *Lynch v. Donnelly*, rather than our or various Justices' attempts at broader doctrinal announcements with less than a Court majority.